Submitted August 26, 2010, affirmed September 28, 2011

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## TYKE THOMAS SUPANCHICK,
*Defendant-Appellant.*

Lane County Circuit Court
200525537; A139011

263 P3d 278

Peter Gartlan, Chief Defender, and Joshua B. Crowther, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Tyke Thomas Supanchick filed the supplemental brief *pro se.*

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

ORTEGA, P. J.

## ORTEGA, P. J.

Defendant held his wife captive and then killed her as police were advancing. Following a jury trial, defendant was convicted of aggravated murder, ORS 163.095, first-degree burglary, ORS 164.225, and attempted coercion, ORS 163.275. He seeks reversal of those convictions, contending that the trial court erred in admitting several out-of-court statements of the victim as well as testimony regarding several statements that defendant made in e-mails to the victim. Defendant also asserts that the trial court improperly excluded testimony offered from a police procedure expert. We reject each of defendant's arguments,[1] and affirm.

The background facts in this case are undisputed. Defendant and the victim, Kelly Supanchick, met while both were serving in the armed forces. They married and later had a child, G, and eventually moved to Eugene, Oregon.

After they had been married for approximately two years, the victim filed a petition under the Family Abuse Prevention Act (FAPA), ORS 107.700 to 107.735, for a restraining order against defendant. In the petition, the victim alleged that, in the previous month, defendant had threatened to beat her and also controlled what and when she ate. She further stated that a couple of years before defendant had threatened to "slit [her] throat" and that there were loaded guns in the house and she feared for her safety. The court issued the FAPA restraining order and, after being served with the order, defendant moved out of the family home and into his parents' house in Junction City.

About a month after having been served with the restraining order, defendant went to the victim's house shortly after midnight. He dressed in military attire and brought with him a loaded shotgun, latex gloves, duct tape, and a large "Ka-Bar" knife. Defendant used his keys to enter the house and, while still carrying the gun, entered the victim's bedroom, where he found the victim awake and reading in bed. He immediately bound the victim, putting socks (which he had also brought with him) over her hands and

---

[1] We reject without discussion all of the assignments of error raised in defendant's *pro se* supplemental brief.

binding her hands together with duct tape. Defendant then offered the victim $1,000 and his car if she would leave the state after executing a document that would state that she was an unfit mother and had lied in the restraining order petition and that she would relinquish custody of G to defendant. Although defendant held the victim captive for several hours, she refused to agree to relinquish custody of G.

Defendant's parents eventually discovered that defendant was gone and had left G, who was visiting for the weekend, sleeping in the bedroom. After unsuccessfully trying to contact defendant and the victim on their cell phones, defendant's father and brother-in-law drove over to the victim's house to determine whether defendant was there. Although they knocked and shouted to the victim to come to the door, no one responded. Finally, defendant's father called the police.

Defendant's father and brother-in-law informed the officers who arrived at the victim's house that they were concerned because they could not locate either defendant or the victim, and that the victim had a restraining order against defendant. The officers knocked on the doors and identified themselves as "Eugene police" and also attempted to look in the windows. No one answered the door or responded. Eventually, an officer looking through the bedroom window saw the victim seated on the bed and called to her to come to the door. Looking "terrified," the victim responded that she couldn't and that she needed help. The officer immediately went to the front door and began to attempt to kick the door in. As the officer tried to get into the house, defendant shot and killed the victim. Defendant was immediately arrested, and police later conducted a lengthy recorded interview of defendant regarding the shooting.

During a search of the victim's house, police found several pages of the victim's handwritten notes. The notes stated, among other things, that defendant had controlled the victim's food intake and that on various occasions defendant had told the victim to "buy a wooden spoon so he could beat [her] with it," that "he'd already dug the hole for [her] for when he 'got rid of [her],' " and that he also threatened to " 'slit [her] throat bilaterally.' "

Defendant was tried on charges of aggravated murder, first-degree burglary, and attempted coercion. He contended that he did not have the requisite mental state for murder and asserted that he suffered from post-traumatic stress disorder (PTSD). At trial, among other things, the recording and a transcript of the police interview of defendant after the killing, the victim's handwritten notes, and the restraining order petition and order were admitted in evidence, and both sides offered expert testimony. Ultimately the jury returned guilty verdicts, and the trial court entered a judgment convicting defendant on all counts.

In his first, second, and third assignments of error, defendant contends that the trial court erred in admitting the victim's statements from her handwritten notes, a non-redacted copy of the restraining order petition, and a nonredacted copy of the FAPA restraining order. He asserts that the trial court erred in admitting those statements under the "forfeiture" exceptions to the hearsay rule. *See* OEC 804(3)(f) - (g). In his view, "OEC 804(3)(f) (the murder forfeiture exception) is unconstitutional, and * * * under OEC 804(3)(g) [(the forfeiture by wrongdoing exception)], the state failed to sufficiently prove that defendant planned to murder [the victim] in order to prevent her from testifying." The state responds that the evidence was offered for non-hearsay purposes and that it was also properly admitted pursuant to OEC 804(3)(f) and (g). We conclude that the statements were properly admitted pursuant to OEC 804(3)(g) and decline to address defendant's contention that OEC 804(3)(f) is unconstitutional.

The forfeiture by wrongdoing exception, codified as OEC 804(3)(g), provides that, if the declarant is unavailable as a witness, the following is not excluded as hearsay:

"A statement offered against a party who engaged in, directed or otherwise participated in wrongful conduct that was intended to cause the declarant to be unavailable as a witness, and did cause the declarant to be unavailable."

The trial court in this case evaluated the admission of the statements at issue pursuant to OEC 804(3)(g), which it understood to "require a foundation or a finding by the

Court * * * that the defendant killed the victim with the purpose of eliminating her as a witness." The court found that such a purpose had been demonstrated:

> "[T]he evidence so far suggests by a preponderance that that was a purpose. It's certainly unclear whether it was the primary purpose. I think that's very confusing as you read * * * the transcript and listen to the defendant's confession. He really is all over the board as to why this homicide was committed.
>
> "* * * * *
>
> "But I am satisfied that at least by a preponderance that was a reason for the * * * homicide and I think that that satisfies the requirement under * * * 804(3)(g). I don't think that that rule requires that it be the primary purpose. I think that it has to be a purpose, and I think that in all probability it is."

Defendant challenges admission of the evidence under OEC 804(3)(g) on several grounds:

> "(1) the victim's statements did not qualify for admission under subsection (g), because the state failed to prove that the primary reason defendant murdered the victim was to prevent the declarant from testifying; (2) the admission of the statements violated defendant's right to confrontation under the Oregon constitution; and (3) in so far as subsection (g) is inconsistent with the federal rule or allows the introduction of the victim's statements without a proof [of] specific intent, then subsection (g) is also unconstitutional under *Giles*[ *v. California*, 554 US 353, 128 S Ct 2678, 171 L Ed 2d 488 (2008)]."

Defendant also argues more generally that there is insufficient evidence that he "contrived his plan to murder the victim in order to prevent her from testifying." None of defendant's arguments is well taken.

We first reject defendant's contention that, in order for OEC 804(3)(g) to apply, his wrongful conduct had to be planned with the primary objective of preventing the declarant from testifying. Under the statute's plain language, set forth above, the exception applies where a defendant (1) directed or participated in wrongful conduct; (2) intended,

by that conduct, to cause the declarant to be unavailable; and (3) did, in fact, cause the declarant to be unavailable. The text contains no requirement that the wrongful conduct be for the sole or primary purpose of causing a witness to be unavailable. Rather, the conduct need only be "intended" to cause that result.

We likewise reject defendant's third contention, that unless the statute is read to include such a sole or primary purpose requirement, it violates the Confrontation Clause of the Sixth Amendment to the United States Constitution, as construed by the United States Supreme Court in *Giles*. There, the Court considered "whether a defendant forfeits his Sixth Amendment right to confront a witness against him when a judge determines that a wrongful act by the defendant made the witness unavailable to testify at trial." 554 US at 355. The Court explained that the Sixth Amendment "contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." 554 US at 358. The only exceptions to that confrontation right are those " 'established at the time of the founding.' " *Id.* (quoting *Crawford v. Washington*, 541 US 36, 54, 124 S Ct 1354, 158 L Ed 2d 177 (2004)). The common-law doctrine of forfeiture by wrongdoing constitutes such a founding-era exception to the confrontation right and permits "the introduction of statements of a witness who was detained or kept away by the means or procurement of the defendant." *Id.* at 359 (internal quotation marks omitted). However, to come within the exception, there must be a "showing that the defendant intended to prevent [the] witness from testifying." *Id.* at 361. The doctrine is essentially equitable in nature and is intended to remove the otherwise "intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them." *Id.* at 365.

Thus, for the forfeiture rule to apply, it is not enough that a court find that a defendant's wrongful act made a witness unavailable to testify. Instead, the defendant must have engaged in wrongful conduct intended to prevent the witness

from testifying and, by such wrongful conduct, must have actually prevented such testimony.[2] Contrary to defendant's assertion, however, the Court's opinion in *Giles* does not suggest that his sole or even primary purpose in making the victim unavailable must have been to prevent the victim from reporting defendant to the authorities or testifying against him. Indeed, it would be "illogical and inconsistent with the equitable nature of the doctrine to hold that a defendant who otherwise would forfeit confrontation rights by his wrongdoing (intent to dissuade a witness) suddenly retains those confrontation rights if he can demonstrate another evil motive for his conduct." *People v. Banos*, 178 Cal App 4th 483, 504 (Cal Ct App 2009), *cert den*, 560 US ___, 130 S Ct 3289 (2010). Thus, we reject defendant's assertion that *Giles* requires us to read OEC 804(3)(g) to require that the sole or primary purpose of his wrongful act was to make the victim unavailable to cooperate with authorities or to testify in proceedings against defendant.

In addition, to the extent that defendant suggests that a defendant must somehow plan in advance his wrongful act with the intent to make the victim unavailable, we reject that contention as well. The Court in *Giles* explains at different points in the opinion that the wrongful conduct at issue must have been "*designed* to prevent the witness from testifying," 554 US at 359 (emphasis in original), and that the defendant must have "intended to prevent a witness from testifying," *id.* at 361. Both of those terms refer interchangeably to the specific intent that the court must find in order for a victim's statements to be admissible under the forfeiture exception. That is, where the court finds that a crime "expressed the intent" to make the witness unavailable and thereby prevent the victim from "reporting [the defendant's conduct] to the authorities or cooperating with a criminal prosecution" against the defendant, the victim's prior statements will be admissible under the forfeiture doctrine. *Id.* at 377.

---

[2] The Court also discussed the application of the exception to abusive relationships, noting that, when such a relationship "culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine." *Giles*, 554 US at 377.

In light of those conclusions, we also reject defendant's more general argument regarding the sufficiency of the evidence. As noted, the trial court found that one of defendant's purposes in killing the victim was to eliminate her as a witness—a finding that is sufficient to satisfy the requirements of OEC 804(3)(g) and the Sixth Amendment. We are bound by that finding of historical fact if there is evidence in the record to support it, *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006), and here the trial court's finding is supported by such evidence.

Specifically, during an interview with detectives, defendant indicated that he had been concerned that the victim would call the police as a result of his violation of the FAPA restraining order. Further, when asked by detectives why he did not just let the victim go, defendant replied, "Because there had to be a better way, a better option than that. A better option because now I'm gonna go to jail for whatever, for being—violating [the restraining order] and having a gun there." And in response to questioning as to why he had "to shoot the gun," defendant responded that "walking out means going to jail and means my daughter goes to her[.]" In light of those statements by defendant to police, we conclude that there is evidence in the record to support the trial court's finding that one of the purposes behind defendant's wrongful act was to prevent the victim from participating in proceedings against him.

Defendant's final contention with respect to the admission of evidence under OEC 804(3)(g) is that the victim's statements "lacked reliability and were therefore inadmissible under Article I, section 11," of the Oregon Constitution. Article I, section 11, provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face[.]" Out-of-court statements made by a declarant who is not testifying are admissible only if two requirements are met. "First, the declarant must be unavailable, and, second, the declarant's statement must have 'adequate indicia of reliability.' " *Cook*, 340 Or at 540 (quoting *State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985)). An out-of-court "statement is considered reliable when it falls within a 'firmly rooted hearsay exception' or when it is accompanied by 'particularized guarantees

of trustworthiness.' " *Id.* (quoting *State v. Nielsen,* 316 Or 611, 623, 853 P2d 256 (1993)).

Defendant contends that the victim's statements "lacked particularized guarantees of trustworthiness" and that "the forfeiture by wrongdoing exception is not 'firmly rooted' and was only recently added to the evidence code in 2005." To the contrary, as we will explain, the exception is indeed "firmly rooted" and, therefore, there need not be a showing of "particularized guarantees of trustworthiness." Accordingly admission of the victim's statements does not violate defendant's confrontation rights under Article I, section 11.

Defendant is correct that in 2005 the legislature adopted OEC 804(3)(g), thereby codifying the forfeiture by wrongdoing exception. Or Laws 2005, ch 458, § 1. However, as the Court detailed in *Giles,* the common-law "doctrine has roots in the 1666 decision in *Lord Morley's Case,* [6 How St Tr 769, 770-71 (HL 1666)], at which judges concluded that a witness's having been 'detained by the means or procurement of the prisoner' provided a basis to read testimony previously given at a coroner's inquest," 554 US at 359, and has been applied through the centuries following that case, *see id.* at 359-65 (discussing cases applying the doctrine in the 1700s and 1800s). Based on that history, the Court described the forfeiture doctrine—which, as noted, required the wrongful act to have been done with the intent to make the declarant unavailable—as an exception that was established at the time of the founding. *See State v. Page,* 197 Or App 72, 80, 104 P3d 616 (2005), *rev den,* 340 Or 673 (2006) (recognizing the "long-established exception to the Confrontation Clause known as the 'forfeiture by wrongdoing' rule"); *see also Reynolds v. United States,* 98 US 145, 158, 25 L Ed 244 (1878) ("if a witness is absent by [a defendant's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away"); *State v. Kayfes,* 213 Or App 543, 555, 162 P3d 308, *rev den,* 343 Or 690 (2007) (the "common-law doctrine of forfeiture by wrongdoing rules bars a defendant from asserting the constitutional right to confront a declarant whom the defendant has caused to be absent from trial"). Given the

centuries-long history of the doctrine of forfeiture by wrong-doing, we conclude that the exception is "firmly rooted" and, accordingly, admission of the victim's statements pursuant to the exception does not violate defendant's Article I, section 11, rights.

We next turn to defendant's fourth assignment of error, in which he asserts that the trial court erred in allowing testimony regarding the content of e-mails he sent to the victim in which he called her a "whore" and told her she was "fat" and "dumb." That evidence was admitted during the state's cross-examination of defendant's psychological expert, Dr. Stanulis, who had reviewed the e-mails as part of his evaluation. According to the state, the e-mail evidence was properly admitted pursuant to OEC 705. We agree with the state.

Defendant never asserted that he did not kill the victim; rather, his defense was that he had done so without the requisite mental state for murder. In support of that contention, he offered expert psychological testimony from Stanulis to establish that he suffered from PTSD.[3] As part of his extensive testimony, Stanulis testified that he diagnosed defendant as having PTSD and recounted the situations that had been sources of high stress or trauma for defendant, including circumstances he encountered in the military, the disintegration of his marriage following his discharge from the military, and being served with the FAPA restraining order shortly before the killing. According to Stanulis, PTSD played a prominent role in defendant's conduct on the day of the incident. As a result of feelings of helplessness, defendant "retreated to what he knew best, his military training." Furthermore, defendant "believed that [the victim] was not raising their daughter correctly" and "that she was so disinvested, he actually believed that the mother of his child

---

[3] Although defendant had not been in combat while in the military, Stanulis testified that defendant had been exposed to certain traumatic events. Specifically, defendant was assigned to work as a military tour guide in the Pentagon, and he held that job on September 11, 2001. Although defendant was not present when the Pentagon was attacked that day, he arrived shortly after and thought "he might have died" had he been present and also knew a person who was killed. Furthermore, according to Stanulis, defendant "faced repetitive, day-to-day exposure to a substance called anthrax that could have killed him" because he had been assigned to test areas in the Pentagon and other government buildings for that substance.

would * * * give her up for $1,000 and a car." According to Stanulis, regression as a result of PTSD made defendant "confused, dazed" and, in light of the perceived threat posed by the victim, he made "a plan to rescue his daughter."

When asked about his view regarding what caused defendant to shoot the victim, Stanulis opined that defendant was "overwhelmed by the noise and the stimuli," retreated to his military training, and shot the victim reflexively and without conscious thought. Stanulis believed that defendant, as a result of PTSD, shot the victim automatically and without any "state of mind." As part of his testimony, Stanulis described defendant as "the least likely person you would expect" to kill the victim. His diagnosis of defendant was based in part on his conclusion that it made no sense for defendant to go to the victim's house in an attempt to pay her off in exchange for their daughter—"that it was a stretch of the imagination to imagine that, in fact, a mother would give up a child for $1,000 and a car."

On cross-examination, the state addressed Stanulis's view that defendant's plan to obtain custody of his daughter made no sense and was part of his PTSD. The state sought to have Stanulis discuss some statements made in "nasty" e-mails defendant had sent the victim, which Stanulis had reviewed as part of his evaluation. Earlier in the trial, the state had sought to introduce a packet consisting primarily of e-mails between the victim and defendant. The court analyzed them "on the probative value versus prejudice, consideration under OEC 403[4]" and concluded that, "taken as a whole, these emails include a lot of material which are of dubious relevance, dubious probative value, even on the issues of state of mind of either party and certainly contain a lot of items that are * * * inflammatory and therefore very prejudicial." Therefore, the court ruled, "looking at the documents as a whole, that the prejudice outweighs any probative value that they may have[.]" However, it noted that, "if the State wishes to identify specific portions which are more

---

[4] Pursuant to OEC 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

directly relevant to" the issues presented, then it would reconsider its ruling as to those specific portions.

When the state then sought to have Stanulis discuss several of defendant's statements in the e-mails as part of its cross-examination of the expert, the court permitted questioning in which the state sought to undermine and discredit Stanulis's testimony by exploring whether defendant's plan on the night of the murder was consistent with his opinion of the victim, expressed in e-mails months prior to the crime. Because the evidence consisted of "statements of the defendant upon which the witness has, in part, based his opinion" and the state "was allowed to cross-examine within reason[,]" the court allowed the inquiry, concluding that the probative value of that limited inquiry outweighed the prejudice. The inquiry went as follows:

> "Q.   And isn't it true that in your review of the emails, for a significant period of time the defendant evidenced his opinion of [the victim]?
>
> "A.   Yeah.
>
> "Q.   Okay. He would refer to her as a whore. Is that right?
>
> "A.   Yes.
>
> "Q.   Okay. That she was fat. Is that right?
>
> "A.   Yes.
>
> "Q.   Okay. And that she was dumb or unintelligent in some fashion or another?
>
> "A.   Something to that effect. I don't recall the exact words, but that would be the tone.
>
> "Q.   Okay. And that was well before the restraining order. Right?
>
> "A.   Yes. That's six months before. * * *
>
> "* * * * *
>
> "Q.   If that is really how he believed about her, why isn't it a good plan?

"A. For the reason I just said. I think it factually would be unrealistic to expect a mother to abandon her child for a thousand dollars.

"Q. Even though she was a fat, dumb whore?

"A. And he also says he's going to come back and make it work.

"Q. * * * I asked you if that's truly how he believed about her—okay? If that's truly how he believed about her, then it's not a bad plan, is it?

"A. Well, obviously he believed it in the night. I'm just telling you my reflection that I thought it didn't reflect the reality and I perceived the name calling as further evidence of the stresses and strains and the disintegration of the marriage, because he also came back and tried to make the marriage work."

According to defendant, the testimony was improper because he did not "open the door" to it and because the evidence was unfairly prejudicial and, therefore, its admission violated OEC 403. The state responds that, whether or not the expert was asked about the e-mails during direct examination, under OEC 705 the state was entitled to cross-examine the expert regarding that evidence. It also asserts that the evidence was not unfairly prejudicial. The issue, then, is whether the evidence was properly admitted on cross-examination in light of the fact that it was reviewed by the expert in evaluating defendant.

Under OEC 705, an expert "may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data [on which the expert relied], unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Under that rule, "[a]fter the [expert] witness has offered an opinion, the opposing party may then seek to elicit the underlying facts or data on which the opinion is based and attempt to rebut or discredit the expert's opinion." *State v. Bigej*, 77 Or App 18, 21, 711 P2d 189 (1985), *rev den*, 302 Or 36 (1986). "The effect of Rule 705 is to allow the cross-examiner to bring out data upon which the expert relied, even if such information was not brought out or permitted to be brought out on direct

examination." Laird C. Kirkpatrick, *Oregon Evidence* § 705.03, 640 (5th ed 2007).

In this case, there is no question that the e-mail evidence at issue was one part of the materials on which Stanulis relied in reaching his conclusions. Defendant's decision not to discuss the evidence with him on direct examination did not prevent the state from inquiring about that evidence under OEC 705. Instead, under the rule, the state could draw out information on which the expert relied in an attempt to rebut the expert's conclusion that, on the night of the killing, defendant's actions were a result of PTSD. That is what the state did here; it challenged Stanulis's conclusions about defendant's plan and state of mind with evidence about the defendant's attitude toward the victim many months before the crime. Under the particular facts and circumstances of this case, that was permissible.

Furthermore, the trial court did not abuse its discretion in ruling that the testimony at issue was not unfairly prejudicial under OEC 403. *See State v. Sparks*, 336 Or 298, 308, 83 P3d 304, *cert den*, 543 US 893 (2004) (the appellate court reviews "a trial court's decision under OEC 403 for an abuse of discretion"). "Under OEC 403, evidence introduced over a defendant's objection is not unfairly prejudicial simply because it is harmful to the defense." *State v. Shaw*, 338 Or 586, 614, 113 P3d 898 (2005). Rather, "the critical inquiry is whether the evidence improperly 'appeals to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact.'" *Id.* (quoting *State v. Barone*, 328 Or 68, 87, 969 P2d 1013 (1998), *cert den*, 548 US 1135 (2000)).

Here, as described above, the central issue was not whether defendant killed the victim; instead, it was whether defendant acted with the requisite intent for murder. Defendant's state of mind toward the victim and the basis for the expert's opinion regarding his mental state related to that central issue in the case. The trial court carefully weighed the competing considerations under OEC 403 and limited the state's inquiry regarding the e-mail evidence to a small number of statements that related to the expert's discussion of defendant's reasons for going to the victim's house on the

night of the killing.[5] In light of the circumstances presented, we conclude that the trial court did not abuse its discretion in admitting the evidence in question.[6]

Finally, in his fifth and sixth assignments of error, defendant contends that the trial court erred in excluding testimony from Howard Webb—an expert in police procedure—"that the detectives who interviewed defendant after the shooting employed the 'Reid technique' " and that "it was his opinion that the responding officer's actions could have [had] an influence on defendant's mental state." We conclude that the court did not err in excluding that testimony.

One part of the proposed testimony from Webb related to whether the police acted properly in attempting to break into the victim's residence after learning that she needed help. Webb would have testified that "entry in these circumstances * * * should be a last resort and under extreme circumstances." Furthermore, the testimony would have been as follows:

"Q. * * * [A]ccording to accepted principles of police science, does breaking into the residence pose a threat of danger to the officer who himself breaks in?

"A. Yes, absolutely.

"Q. Does breaking into the residence pose a threat to the victim, the person who may be a hostage?

"A. Yes.

"Q. Does breaking into a residence pose a threat [to the safety of] the—to the hostage taker, the assailant or the suspect, whatever you may call it?

_____

[5] In addition, in response to an assertion from defendant that, "if some of the emails become admissible, and specifically we're talking about the emails from [defendant] to [the victim], the emails from [the victim] to [defendant] should be admissible too," the court offered defendant the option of admitting the "whole batch" if he so chose.

[6] With respect to balancing probative value with unfair prejudice, we also note that any prejudice from the evidence was limited given that, in his interview with police (which the jury had by video and transcript), defendant referred to the victim in a similar manner. Specifically, in the interview, among other things, defendant stated that the victim was not a good person, lied all the time, was an unfit mother, and was "an idiot" who would take a bribe and "the kind of idiot who does stuff like that." He also stated that he hated her "for being a whore when [he] met her" and for being "a piece of shit[.]"

"A.   Yes.

"Q.   Is there a concern about whether breaking in the residence may have an effect or an impact on the state of mind of the hostage taker?

"A.   Yes.

"Q.   What is that concern?

"A.   Well, the concern is that you have someone who already is in, you know, fragile or unstable mindset, an emotional state. I mean that's—normal people don't arm themselves and go take people hostages, you know, unless they're caught in some kind of robbery situation. But in a domestic violence situation, you already have someone who's not thinking clearly.

"Q.   Right.

"A.   So any kind of action that could push this person over the edge, you know, forcing an entry when it was absolutely not necessary, could create substantial risk to everybody involved."

After hearing argument by the parties regarding whether that testimony was admissible, the trial court reasoned:

"Nobody is denying that there was this protocol and that, for reasons that they explained, it wasn't used in this case. Getting into the reasoning behind the protocol would seem to be irrelevant and would go beyond—if you're trying to get to this specific defendant's state of mind, that is, did he act intentionally, knowingly, or recklessly, I don't believe that witness can—your expert witness is qualified to testify to that. I think that requires a psychologist. Simply saying that it's a volatile situation and it might push somebody over the edge doesn't tell us a whole lot."

The court observed that the defense was "trying to show that the officers were somehow at fault in causing the death of the victim," and the defense agreed that it was: "If they hadn't done what they did, this case wouldn't have happened." The court explained, however, that

"that's not an issue before the jury. The jury issue is: Did the defendant act—he's admitted that he did the shooting. So really the issue is did the defendant act with a reckless state of mind, did he act in order to further the burglary, did

he act intentionally, knowingly, and recklessly as the case may be if we get down to lesser included. I think going beyond and then asking this witness to comment on that goes beyond his expertise."

Thus, the trial court did not allow the testimony to be presented to the jury. We review the trial court's relevance determination and its conclusion regarding the expert's qualifications as a matter of law. *State v. Rogers*, 330 Or 282, 315, 4 P3d 1261 (2000); *State v. Harberts*, 198 Or App 546, 561, 108 P3d 1201 (2005), *rev den*, 341 Or 80 (2006). Based on that review, we agree with the trial court's reasoning and conclusions.

Pursuant to OEC 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As noted, there was no question in this case that defendant shot and killed the victim. The issue the jury had to decide was his mental state at the time of the killing; defendant argued that he did not kill the victim with the requisite mental state for murder. Webb's testimony was offered to show that the police might have been able to prevent the killing if they had proceeded differently or, as defendant put it, that, "[i]f they hadn't done what they did, this case wouldn't have happened." However, that issue was not relevant to what the jury was called upon to decide—that is, it did not have any bearing on the defendant's state of mind at the time he killed the victim.

Further, as the trial court noted, Webb was not qualified to testify regarding defendant's state of mind at the time of the killing. Under OEC 702, where "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Webb's training and experience was in police procedure; he had a bachelor's degree in criminal justice and was the director of a "nonprofit law enforcement and public safety education training organization." He had been the director of a law enforcement academy, the director of

training for a body armor manufacturer, and the "use-of-force expert and the chief defensive tactics and also survival expert for the State of Oregon." He had delivered extensive criminal justice instruction and also authored a large number of criminal justice programs. There is no question that he was qualified to testify regarding proper police procedures. However, Webb had no psychological or other education or experience that qualified him to render an opinion as to what defendant's state of mind was when he killed the victim. That was the issue before the jury. For those reasons, we conclude that the trial court properly excluded Webb's testimony regarding whether it was proper for police to attempt to enter the victim's residence under the circumstances presented here.

Likewise, we conclude that the court properly excluded Webb's testimony regarding whether officers conducting the interview of defendant used the "Reid" interview technique. According to defendant, that evidence should have been admitted because "[w]hether the police employed a particular interview technique could be relevant to the voluntariness of defendant's statements." (Boldface omitted.) In particular, defense counsel asked Webb whether the detectives used the "Reid" method when they interviewed defendant and Webb testified that there were differences in what detectives did in the interview and what the "Reid" method would require, but that much of the interview "[fell] in line with the Reid method of interrogation[.]" The court excluded that testimony for a number of reasons: "the officer said he didn't use the Reid method[,]" the "expert said [the officer] didn't use the Reid method," and,

> "we don't know what the Reid method is. We don't know why it's significant whether he used it or not. We have * * * the transcript and the * * * video of the interrogation. The jury can see what was done and what wasn't done. I don't understand whether * * * he used this method or that method, what difference it makes, unless there's some inherent showing that a particular method is unfair or * * * unprofessional."

The court further explained that

> "the evidence speaks for itself. You can say, Look, he asked these questions and that was designed to do this and fool

the defendant or confuse him or whatever. I mean that's before the jury. But it seems to me that this testimony about the Reid method without more—which all we have now is the fact that the earlier officer said they didn't use it and [Webb] said he sort of did and sort of didn't—we still don't know anything about it, whether it's designed to do [something improper] or that it's just designed to get information.

"At this point there's just no relevance shown to it."

We agree.

As set forth above, to be relevant, evidence must make some fact of consequence more or less likely than it would be without the evidence. In this case, defendant contends that the evidence was relevant to whether his statements to the police during the interview were voluntary. However, as the court noted, the testimony was simply that the officers did not fully follow the "Reid" interview method, but that much of the interview was "in line" with the technique. The expert did not go through what the technique consisted of or explain why it might matter. He did not talk about what the "Reid" technique is designed for or explain that there was something improper about it. Like the trial court, we conclude that the information offered would not make any fact of consequence more or less likely. Furthermore, we note that there was video and transcript evidence before the jury and that bare testimony that the interview was, in part, like the Reid method, without more, would not assist the jury in understanding that evidence or in determining the voluntariness of defendant's statements.

Affirmed.