No. 7 February 13, 2014 737

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

TYKE THOMAS SUPANCHICK,
*Petitioner on Review.*

(CC 200525537; CA A139011; SC S060017)

On review from the Court of Appeals.*

Argued and submitted November 6, 2012; resubmitted January 7, 2013.

Joshua B. Crowther, Chief Deputy Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Peter Gartlan, Chief Defender.

Michael A. Casper, Deputy Solicitor General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Brewer, and Baldwin, Justices.**

KISTLER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

\* Appeal from Lane County Circuit Court, Gregory G. Foote, Judge. 245 Or App 651, 263 P3d 378 (2011).

\*\* Landau, J., did not participate in the consideration or decision of this case.

**KISTLER, J.,**

In 2005, the Oregon legislature added a new exception to the prohibition against the admission of hearsay evidence. Or Laws 2005, ch 458, § 1; *see* OEC 804(3)(g). Under that exception, a declarant's hearsay statements are admissible against a party "who engaged in \*\*\* wrongful conduct that was intended to [and did] cause the declarant to be unavailable as a witness." OEC 804(3)(g).[1] Throughout this litigation, defendant has argued that his wife's hearsay statements do not come within the terms of that exception and that, if they do, admitting her statements violated his rights under the state and federal constitutions. The trial court disagreed, a jury convicted defendant of aggravated murder, and the Court of Appeals affirmed the resulting judgment. *State v. Supanchick*, 245 Or App 651, 263 P3d 378 (2011). We allowed defendant's petition for review and now affirm the Court of Appeals decision and the trial court's judgment.

I

The state charged defendant with aggravated murder for killing his wife. The evidence showed that defendant and his wife were estranged and that, shortly before her death, his wife had obtained a restraining order against defendant based on allegations that defendant had physically and emotionally abused her.[2] One week after the trial court issued the restraining order, defendant filed for divorce.

---

[1] OEC 804(3)(g) provides that the following hearsay statements are admissible:

"A statement offered against a party who engaged in, directed or otherwise participated in wrongful conduct that was intended to cause the declarant to be unavailable as a witness, and did cause the declarant to be unavailable."

The state argued at trial that the wife's hearsay statements were also admissible under OEC 804(3)(f), but it has not pursued that argument on appeal or review. Rather, as the state recognizes, *Giles v. California*, 554 US 353, 128 S Ct 2678, 171 L Ed 2d 488 (2008), raises substantial doubts about the constitutionality of OEC 804(3)(f).

[2] Midway through trial, the state sought to introduce statements that defendant's wife had made both in support of the restraining order and in preparation for seeking the restraining order. In deciding whether that evidence was admissible under OEC 804(3)(g), the trial court held an OEC 104 hearing and based its factual findings in that hearing on the evidence that previously had been admitted at trial. We state the facts consistently with the trial court's rulings in the OEC 104 hearing.

Approximately one month after defendant's wife had obtained the restraining order and three weeks after defendant had filed for divorce, defendant devised a plan to persuade his wife to recant the allegations against him, give him custody of their daughter, and leave the state. Defendant believed that his wife had no real interest in their daughter, had been indifferent to their daughter's safety, and "just want[ed] to have money and go party[.]" Defendant also believed that, if he offered his wife some money, he could persuade her to accept his offer—namely, to recant the allegations, give him custody of their daughter, and leave Oregon. One problem, from defendant's perspective, was how to speak to his wife without her calling 9-1-1 and reporting that he was violating the restraining order.

At eleven o'clock one night, defendant took a loaded shotgun, duct tape, and a knife to his wife's house. He opened the door and went up to her bedroom, where she was reading a book in bed. He walked in carrying the shotgun, told her that "we're going to talk about this[, a]nd then [he] put the tape on her mouth so she wouldn't scream and *** taped her arms." When asked whether he had pointed the shotgun at her, defendant replied, "Didn't need to."

As defendant later explained, his plan was to "go through the door real quick [and] subdue her to the point where *** she's not a threat" to call 9-1-1 and report his violation of the restraining order.[3] Defendant believed that, if he had a chance to talk with his wife before she could call 9-1-1, he would be able to persuade her, relatively quickly, to accept to his offer. Going in, defendant believed that the whole operation could be accomplished in "[a]n hour, tops."

Things did not go according to plan. His wife would not agree to give defendant custody of their daughter, nor would she agree to leave the state. The discussion that defendant had anticipated would be accomplished quickly turned into a four-hour "talk." As defendant explained, "we started talking way too much." He still believed, however,

_____

[3] As defendant put it earlier in his confession, his initial actions were intended to be a "quick fix. *** When you go in, you zip tie them and you flex-cuff them and tape their mouth," a course of action that he described as standard operating procedure for stabilizing a situation.

that they "were getting stuff out" and having a meaningful conversation. He explained:

> "She wasn't gonna—she wasn't gonna leave, but we were making headway as far as her saying, Yeah, a lot of stuff [she was] doing isn't fair, and you—you know, [she] do[es] need to give [me my] money [back]. [She] shouldn't be keeping this money [that, in defendant's view, his wife had wrongfully taken from him]."

One issue that arose was how, once defendant knew that his wife would not agree to all his terms, he could keep her from reporting that he had violated the restraining order. Defendant explained that he thought that they would be able to find a middle ground; he would leave, she would "just *** drop it," and "she will find something that makes it—makes it a bonus to her, you know." When asked later if he would have let his wife walk out of the house if she had asked to do so, defendant answered, "No, because we hadn't reached a—a— *** Not before there was some—not before there was a hard copy agreement ***."

After defendant had been at his wife's house for several hours, his mother called him on his wife's cell phone, but he did not answer. He also saw his sister's husband outside the house, but he did not go out to talk to him. Defendant explained that he "wasn't there to talk to them. I was—we [defendant and his wife] were having a good conversation." He believed that he was "getting through to [his wife] that she was really not helping [their daughter] right now." Then, defendant heard "heavy" knocking and people announcing that they were police officers. They asked his wife to come to the door, but she shouted, "I can't. I can't come to the door." At that point, defendant heard "the noise, this noise." As the officers kicked open the door of his wife's house, defendant picked up the shotgun, put a round in the chamber, and shot his wife.

When the officers spoke with defendant afterwards, they asked him two separate but related questions. The first question was why he had not let his wife leave once the officers got there. The second was why he had shot her. In answering the first question, defendant explained, "[b]ecause there had to be a way, a better option than [letting

her walk out]. A better option because now I'm gonna go to jail for whatever, for being—violating parole [*sic*] and having a gun there." He added that he was not "sitting there weighing it. It was like, you know, there's got to be a better way to fix this or a better way to go—for—I don't know. Better way for my daughter to be safe and [for me] not [to] go to jail." When asked whether "shooting her [was] that better way," defendant answered, "I wasn't saying that at all."

When asked why he shot his wife, defendant initially either did not or could not accept the possibility that he had shot her. Later, he acknowledged that, because no one else was in the house, he must have killed her. Defendant then told the officers that, when he heard "this noise," he "did a failure drill." As defendant explained, a failure drill is appropriate when you have "no chance of the—whatever, you know, what—your target is coming at you." He added that "[i]t's the most successful way of stopping whatever's coming at you." Having explained that a failure drill is intended to stop the "target *** coming at you," defendant could not explain why he shot his wife rather than the officers coming through the door.

In ruling on the admissibility of statements that defendant's wife had made in applying for a restraining order and also notes that she had made for that purpose, the trial court explained that OEC 804(3)(g) requires "a finding *** by the court that—that the purpose—that the defendant killed the victim with the purpose of eliminating her as a witness." The trial court then found:

> "I think that the evidence so far suggests by a preponderance that that was a purpose. *** I think that's very confusing as you read—as you read the transcript and listen to the defendant's confession. *** But I am satisfied that at least by a preponderance that was a reason for the—for the homicide and I think that that satisfies the requirement under [OEC] 804(3)(g). I don't think that that rule requires that it be the primary purpose. I think that it has to be a purpose, and I think that in all probability it is."

The court also reasoned that, although OEC 804(3)(g) does not require a showing that the statements are reliable, reliability "does come up insofar as analyzing [the statements]

for their relevance" under OEC 401 and also in analyzing whether the statements' probative value outweighs their prejudicial value under OEC 403. *Cf. State v. Lawson/James*, 352 Or 724, 750-51, 757, 291 P3d 673 (2012) (explaining that OEC 403 and other evidence code provisions "articulate minimum standards of reliability intended to apply to many types of evidence").

Having concluded that the wife's statements were admissible under OEC 804(3)(g), the court then considered whether those statements met the requirements of other provisions of the evidence code. It initially excluded some of the wife's notes because they were too cryptic to be relevant. *See* OEC 401. It then excluded all the remaining statements because, taken as a whole, those statements were more prejudicial than probative. *See* OEC 403. Although the court ruled that the statements, taken as a whole, were not admissible, it invited the state to identify specific statements that it wanted to introduce. The state did so, and the trial court ruled that some of the statements in the petition for a restraining order and also some of the notes that the wife had made complied with OEC 403 and were admissible. Those notes showed that defendant had told his wife "to buy a wooden spoon so that he could beat [her] with it," that "he'd already dug the hole for [her] for when he 'got rid of [her],'" and "that he had threatened to 'slit [her] throat bilaterally.'" After considering that and other evidence, the jury convicted defendant of aggravated murder, and the Court of Appeals affirmed the resulting judgment.

## II

The issues on which defendant focuses on review all arise out of the trial court's ruling admitting his wife's hearsay statements. Defendant argues that the evidence was insufficient to establish the mental state necessary to invoke OEC 804(3)(g)—namely, that he engaged in wrongdoing with the intent "to cause [his wife] to be unavailable as a witness."[4] Beyond that, defendant contends that the common-law doctrine of forfeiture by wrongdoing required not only that a party purposefully have procured the witness's

---

[4] Defendant does not dispute that the trial court could find that his conduct was "wrongful" and that his conduct caused his wife to be unavailable.

absence but also that any hearsay statements admitted under that doctrine have an independent guarantee of reliability. Defendant reasons that OEC 804(3)(g), Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution all incorporate the common-law requirement that any statements admitted under the forfeiture doctrine be reliable. Finally, defendant argues that his wife's statements were so unreliable that their admission violated the Due Process Clause of the Fourteenth Amendment.[5] Defendant reasons that the admission of his wife's statements prejudiced him because those statements undercut his defense that he had not intentionally shot his wife.[6]

A

Defendant's sufficiency argument may turn on one of two propositions. Defendant may be arguing that the evidence is insufficient to support the finding that the trial court actually made (that a purpose in killing his wife was to eliminate her as a witness). Alternatively, defendant's argument may turn on the proposition that the evidence does not support the finding that, in his view, the trial court should have made. Specifically, his argument appears to assume that OEC 804(3)(g) required the trial court to find that he intended to prevent the admission of his wife's testimony in an "ongoing matter," that he acted based on a preconceived plan or design, and that his "primary purpose" in killing her was to eliminate her as a witness.

1

For the wife's hearsay statements to be admissible under OEC 804(3)(g), the state had to show that defendant had "engaged *** in wrongful conduct that was intended to [and did] cause the [wife] to be unavailable as a witness." *See* OEC 804(3)(g) (stating that requirement).[7] What defendant

---

[5] We limit our discussion to those issues.

[6] One of defendant's theories at trial was that he shot his wife while he was suffering from post-traumatic stress disorder and that, as a result, he lacked the capacity to act intentionally. His wife's statements permitted the jury to infer that he acted intentionally when he shot her.

[7] OEC 804(3)(g) requires proof of a specific intent—an intent to make the declarant unavailable as a witness. The trial court correctly focused on defendant's purpose in killing his wife in determining whether he had the requisite intent.

intended is a question of fact, and the issue for the trial court was whether the state had proved defendant's intent by a preponderance of the evidence. *See State v. Carlson*, 311 Or 201, 209, 808 P2d 1002 (1991) (identifying the standard of proof for preliminary questions of fact bearing on the admissibility of evidence). In this case, the trial court used the correct standard of proof: It found by a preponderance of the evidence that one reason why defendant killed his wife was to eliminate her as a witness. We are bound by that factual finding if there is evidence in the record to support it. *See State v. Cunningham*, 337 Or 528, 538, 99 P3d 271 (2004) (stating the standard of review for preliminary factual findings bearing on the admission of evidence).

As the trial court implicitly recognized, the evidence permitted a finding that defendant had more than one purpose in killing his wife. For example, the evidence permitted a finding that defendant killed his wife to prevent her from retaining custody of their daughter; that is, he believed that, while he had been away in the military, his wife had neglected their daughter and endangered her safety. His wife would not agree to give up custody of their daughter, and the trial court could have found that defendant killed his wife to ensure that their daughter would not remain in her care.

There was also evidence to support the trial court's finding that one purpose in killing his wife was to make her unavailable as a witness. When the officers spoke with defendant shortly after he killed his wife, he told them that, when he first entered his wife's home, he had taken elaborate steps to prevent her from calling 9-1-1 and reporting that he was violating the restraining order. He had confronted her with a shotgun, bound her hands, and put tape over her mouth. Moreover, he believed that he could persuade his wife, in return for giving her money, to recant the allegations against him, give him custody of their daughter, and leave the state.

Defendant told the officers that, when it became clear that his wife would not agree to all the terms of his offer, he still thought that they could reach a compromise

where he could give her something and she would "just \*\*\*
drop it"—namely, his violation of the restraining order. He
was clear, however, that he would not let his wife leave, even
if she had asked to do so, until he had a "hard copy agree-
ment." The trial court reasonably could find that defendant
feared that, if his wife left without having signed a "hard copy
agreement," she would report his violation of the restraining
order, he would go to prison for having violated the order,
and his wife would retain custody of their daughter.

Even after the police arrived and were asking
defendant to let his wife go, defendant explained that he
continued to think that there had to be a better option than
letting his wife walk out of the house. To his mind, if he let
her walk out, "I'm gonna go to jail for whatever, for being—
violating parole [*sic*] and having a gun there." As he
explained, there had to be a "[b]etter way for my daughter
to be safe and [for me] not [to] go to jail." One constant
theme that ran through defendant's confession was his con-
cern that, without an agreement, his wife would report his
violation of the restraining order, he would go to jail as a
result, and his daughter would not be safe. Given that evi-
dence, the trial court permissibly found that one reason why
defendant killed his wife was to prevent her from reporting
what he had done.

To be sure, it would not have taken a great deal of
reflection for defendant to realize that the consequences of
killing his wife were far graver than the consequences of vio-
lating the restraining order. But defendant acted in a split
second as the officers kicked open the door to his wife's home,
and the trial court reasonably could have found that the
forces that drive a person's actions are not always the most
rational ones. Moreover, as the trial court implicitly found,
eliminating his wife as a witness was not defendant's sole
purpose in killing her, and we cannot say that the evidence
does not support the trial court's factual finding that it was
one reason for shooting her. Put simply, there is evidence in
the record to support the trial court's factual finding that
one reason defendant killed his wife was to eliminate her as
a witness. *See Cunningham*, 337 Or at 538-39 (stating the

standard of review for predicate factual findings regarding the admission of evidence).[8]

2

As noted, defendant's sufficiency argument may rest alternatively on a series of unexplained assumptions. His argument appears to assume that, for his wife's statements to be admissible under OEC 804(3)(g), he must have sought to prevent his wife from testifying in an "ongoing matter"; he must have had a preconceived "design" or "plan" to kill her; and his "primary purpose" in killing her must have been to eliminate her as a witness. Although those assumptions are woven into defendant's OEC 804(3)(g) argument, he never identifies where in the text, context, or history of that rule he finds them. We address those assumptions briefly.

Defendant's argument assumes initially that OEC 804(3)(g) requires that the party against whom the hearsay statements are offered must have acted to prevent the declarant from being a witness in "an ongoing matter." However, nothing in the text of OEC 804(3)(g) requires that a matter be ongoing when the party acts to eliminate a witness. Rather, the text of that rule requires only that the party have engaged in wrongful conduct that was intended to (and did) cause the declarant to be "unavailable as a witness." Ordinarily, a witness is "one [who] gives evidence regarding matters of fact under inquiry." *Webster's Third New Int'l Dictionary* 2627 (unabridged ed 2002). The use of the word "witness" contemplates an "inquiry"; it does not require an "ongoing proceeding."

Were there any doubt about the matter, the context resolves it. The legislature enacted OEC 804(3)(g) in response to *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). Minutes, Senate Committee on Judiciary, SB 287, Feb 8, 2005 (remarks of Tom Lininger). In *Crawford*, the Court explained that the Sixth Amendment requirement that, in all criminal prosecutions, the accused

---

[8] The question whether the evidence was admissible under OEC 804(3)(g) differs from the question whether defendant was criminally liable for murdering his wife. It goes without saying that, in deciding the latter issue, the jury was free to view the evidence differently from the way that the trial court did in ruling on defendant's objection to the admission of his wife's statements.

"shall enjoy the right \*\*\* to be confronted with the wit-
nesses against him" is not limited to "in-court testimony."
*Id.* at 50. Rather, it extends to testimonial statements made
during the course of a police investigation. *Id.* at 52. Under
that reasoning, testimonial statements made to police offi-
cers during the course of a police investigation or inquiry
are statements from a "witness" within the meaning of the
Sixth Amendment Confrontation Clause. *Id.*

Not only did the Court define "witness" broadly in
*Crawford*, but it also recognized that forfeiture by wrong-
doing is one of a limited set of exceptions to the Sixth
Amendment confrontation right. *See id.* at 62 (explaining
that "the rule of forfeiture by wrongdoing (which we accept)
extinguishes confrontation claims on essentially equita-
ble grounds"). As noted, the Oregon legislature enacted
OEC 804(3)(g) to codify, as part of the Oregon evidence code,
the doctrine of forfeiture by wrongdoing that the Court had
identified in *Crawford*. That context confirms what the text
of OEC 804(3)(g) suggests: The Oregon legislature intended
the word "witness" in OEC 804(3)(g) to be as broad as the
Court interpreted it in *Crawford*. Defendant identifies no
basis for thinking that the Oregon legislature intended
OEC 804(3)(g) to reach only a subset of the statements to
which, as *Crawford* explained, the Sixth Amendment other-
wise would apply.

In this case, the trial court could have found that
defendant killed his wife to keep her from reporting his vio-
lation of the restraining order to the officers—*i.e.*, to keep
her from being a "witness" as *Crawford* used that term.
Moreover, defendant stated that, if he had let his wife walk
out when the police arrived, he faced the prospect that he
would go to prison and his wife would retain custody of their
daughter. Given that statement, the trial court reasonably
could have found that defendant killed his wife to keep her
from testifying in a future contempt proceeding for violating
the restraining order and in the pending divorce proceeding
regarding custody.

Defendant's sufficiency argument also rests on the
proposition that the trial court had to find that he killed his
wife as part of a "plan" or "design" to make her unavailable

as a witness. To the extent that defendant uses those terms as synonyms for "intent," his argument adds little. The text of the rule requires proof of a specific intent—that defendant "intended" to make his wife unavailable as a witness— and that intent is synonymous with defendant's purpose in killing her. To the extent, however, that defendant means that the trial court had to find that he had a preconceived plan formed before he entered his wife's home, he identifies nothing in the text, context, or history of OEC 804(3)(g) that supports that proposition. Defendant appears to find that requirement in the Court's use of the word "designed" in *Giles v. California*, 554 US 353, 128 S Ct 2678, 171 L Ed 2d 488 (2008). However, not only did the Court use the word "designed" in *Giles* to explain only that a party must have acted for the purpose of making the witness unavailable,[9] but *Giles* was decided three years after the Oregon legislature enacted OEC 804(3)(g). What the Court said in *Giles* in 2008 has no bearing on what the Oregon legislature meant in 2005.

Finally, defendant suggests that his wife's statements were admissible under OEC 804(3)(g) only if his "primary purpose" in killing her was to make her unavailable as a witness. The text of the rule does not impose that requirement. It provides that a declarant's statements are admissible if the party against whom they are offered engaged in wrongdoing that was "intended to [and did] cause the declarant to be unavailable as a witness." Nothing in the text of the rule requires that a party have had only a single purpose in engaging in wrongdoing, nor does anything in the text of the rule require that one purpose predominate over another. Rather, if one purpose for killing his wife was to make her unavailable as a witness, as the trial court found, then the trial court could find that defendant intended to make his wife unavailable, as OEC 804(3)(g) requires.

---

[9] The California Supreme Court had held in *Giles* that the doctrine of forfeiture by wrongdoing applies if the defendant's acts had the effect of making a witness unavailable for trial. *See Giles*, 554 US at 357. The United States Supreme Court used the term "designed" in *Giles* to distinguish acts taken for the purpose of making a witness unavailable from acts that merely had that effect. *See id.* at 359-60. Indeed, the Court later used "intended" synonymously with "designed." *See id.* at 361. To the extent that defendant draws more from *Giles*' use of that word, he reads *Giles* too broadly.

Defendant appears to base his contrary argument on a 2012 Texas Court of Appeals case applying *Giles. See Bibbs v. State*, 371 SW3d 564, 569-70 (Tex Crim App 2012) (stating, without explanation, that a "closer reading" of *Giles* showed that the doctrine of forfeiture by wrongdoing did not apply because the defendant in *Bibbs* had engaged in wrongdoing for two equally likely purposes, one of which was to make the declarant unavailable as a witness). Not only did the Texas Court of Appeals not identify what in *Giles* led it to that conclusion, but its reasoning is difficult to reconcile with what *Giles* actually said.

The Court was careful to explain in *Giles* that forfeiture by wrongdoing applies in domestic violence cases because "[a]cts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions." 554 US at 377. The Court added:

> "Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine."

*Id.* Acts of domestic violence that culminate in murder can reflect a complex of motives; limiting forfeiture by wrongdoing to those instances in which the defendant's primary motive or purpose was to make the declarant unavailable would undercut the majority's explanation of the ways in which the forfeiture doctrine will apply in domestic violence cases. It also would negate a premise of the concurring opinion in which two justices whose votes were necessary to form a majority in *Giles* joined. *See id.* at 380 (Souter, J., concurring in part) (recognizing the complex of motives that can give rise to domestic violence that results in murder and that accordingly can lead to the application of the doctrine of forfeiture by wrongdoing).[10]

---

[10] In any event, an unexplained 2012 Texas Court of Appeals interpretation of the Court's 2008 decision in *Giles* has no bearing on the meaning of an Oregon rule of evidence enacted in 2005.

B

Defendant raises a different reason why, in his view, his wife's hearsay statements were not admissible under OEC 804(3)(g). He argues that OEC 804(3)(g) requires that any hearsay statement admitted under that rule must have an independent guarantee of reliability. Defendant's argument is difficult to square with the text, context, and legislative history of OEC 804(3)(g). The text of OEC 804(3)(g) does not require a showing that hearsay statements admitted pursuant to that rule have an independent guarantee of reliability. Rather, it requires only a finding that the party against whom the statements are offered has engaged in wrongdoing that was intended to and did cause the declarant to be unavailable as a witness.

Not only does the text of OEC 804(3)(g) omit the requirement that defendant would add, but the context cuts against defendant's argument as well. As noted above, the legislature enacted OEC 804(3)(g) in response to *Crawford*, particularly its recognition that "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds." *See* 541 US at 62. In explaining that the rule of forfeiture by wrongdoing extinguishes confrontation claims on equitable grounds, the Court also explained that the rule "does not purport to be an alternative means of determining reliability." *Id*. That context undercuts defendant's claim that the Oregon legislature would have understood that a statement must have an independent guarantee of reliability to come within the terms of OEC 804(3)(g).

Finally, the legislative history of OEC 804(3)(g) provides no support for defendant's arguments. No legislative history affirmatively shows an intent to add the requirement that defendant would. Indeed, the Oregon legislature considered and rejected an amendment that would have required courts to conduct a separate examination of a statement's reliability before admitting that statement under OEC 804(3)(g). *See* Tape Recording, Senate Committee on Judiciary, SB 287, Apr 11, 2005, Tape 102, Side A (testimony

by Erik Wasmann).[11] In speaking in favor of not including that requirement in OEC 804(3)(g), Senators Prozanski and Burdick reasoned that other provisions of the evidence code, including OEC 401 (excluding irrelevant evidence) and OEC 403 (excluding relevant evidence where its probative value is substantially outweighed by the risk of unfair prejudice), as well as the Due Process Clause of the Fourteenth Amendment, provided some guarantee of reliability and obviated the need to require, as part of OEC 804(3)(g), that any hearsay statements admitted pursuant to that exception contain independent guarantees of reliability. They reasoned that, if those other provisions proved insufficient to protect against the admission of unreliable evidence, the legislature could remedy that problem in the future.

Defendant notes, however, that legislators referred to the proposed rule as the "common-law" rule of forfeiture. Defendant reasons that, because the common law admitted only reliable evidence under the forfeiture exception, the mention of the "common law" imported a reliability inquiry into OEC 804(3)(g) that the text of that rule omitted. Defendant's argument is problematic for two reasons. First, as explained below, the separate reliability requirement that defendant perceives as a common-law requirement is faint to nonexistent. Second, defendant's argument proves too much. In context, the mention by legislative committee members of "common law" shows only that the members were aware that the rule originated from older common-law cases. That awareness, however, falls far short of expressing an understanding that all the features of the common-law rule, as defendant perceives them, were incorporated into the OEC 804(3)(g). Defendant's arguments based on OEC 804(3)(g) are not well taken, and we turn to his arguments under the state and federal constitutions.

---

[11] Ordinarily, the legislature's failure to enact legislation does not provide persuasive evidence of the legislature's intent. *Berry v. Branner*, 245 Or 307, 311, 421 P2d 996 (1966). In this case, however, the legislature made a considered decision to omit a proposed requirement from the bill that became OEC 804(3)(g). That decision is a telling piece of legislative history. *Cf. State ex rel Juv. Dept. v. Ashley*, 312 Or 169, 179, 818 P2d 1270 (1991) (relying on legislative history showing that the legislature considered including but chose not to include drug treatment records in OEC 504).

## III

Under Article I, section 11, of the Oregon Constitution, "the accused shall have the right * * * to meet the witnesses face to face * * *" in all criminal prosecutions. Under that provision, out-of-court statements made by a declarant who does not testify at trial are, as a general rule, admissible only if (1) the declarant is unavailable and (2) the statements have adequate indicia of reliability. *State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985) (adopting the test from *Ohio v. Roberts*, 448 US 56, 66, 100 S Ct 2531, 65 L Ed 2d 597 (1980)); *but cf. State v. Copeland*, 353 Or 816, 306 P3d 610 (2013) (reasoning that some out-of-court statements are not "witness statements" and do not require that the declarant be unavailable to satisfy Article I, section 11).[12] A statement that falls within a "firmly rooted hearsay exception" or has "particularized guarantees of trustworthiness" is considered "reliable" under *Campbell* and *State v. Nielsen*, 316 Or 611, 623, 853 P2d 256 (1993).[13]

In this case, the trial court ruled that admitting the wife's hearsay statements posed no constitutional problem, apparently on the strength of *Crawford*'s recognition that forfeiture by wrongdoing is an exception to the federal confrontation right. The Court of Appeals upheld that ruling on an additional ground. Noting that the origins of the doctrine of forfeiture by wrongdoing date to the seventeenth century, the court concluded that that doctrine was a "firmly rooted" exception by virtue of that history. *Supanchick*, 245 Or App at 660-61. Accordingly, admitting statements under OEC 804(3)(g) does not run afoul of Article I, section 11.

Defendant argues that forfeiture by wrongdoing is not a "firmly rooted hearsay exception," as *Campbell* used that phrase; he reasons that it is not a hearsay exception at

---

[12] The state does not contend that the wife's hearsay statements are not "witness statements" within the meaning of Article I, section 11.

[13] In *Crawford*, the United States Supreme Court revised the federal Confrontation Clause framework, holding that testimonial evidence found "reliable" under *Roberts* does not necessarily satisfy the Sixth Amendment right to confrontation. 541 US at 54-56. This court, however, has continued to use the *Roberts* framework in analyzing the confrontation right under Article I, section 11. *See State v. Cook*, 340 Or 530, 540, 135 P3d 260 (2006) (so stating); *see also Copeland*, 353 Or at 839 (reaffirming *Campbell*).

all but an equitable principle applied without regard to the evidence's inherent reliability. Further, defendant contends that, if this court recognizes forfeiture by wrongdoing as an exception to the state confrontation clause, the rule must retain the features it had at common law. In defendant's view, at common law, certain procedural requirements, unrelated to the forfeiture doctrine itself, ensured that statements admitted under the forfeiture doctrine would be reliable. It follows, defendant argues, that Article I, section 11, requires similar guarantees of reliability before statements can be admitted under the doctrine of forfeiture by wrongdoing. Finally, defendant argues that parties cannot relinquish their state confrontation rights unless they knowingly and intelligently waive them.

The state responds that deciding whether forfeiture by wrongdoing satisfies *Campbell* is unnecessary because forfeiture is an equitable principle necessary to protect the integrity of judicial proceedings. Precisely for that reason, the state argues, forfeiture defeats a defendant's right to challenge unconfronted evidence under Article I, section 11. In the state's view, forfeiture by wrongdoing is consistent with this court's cases holding that defendants can relinquish constitutional rights through misconduct.

A

As a starting point, we agree with the parties that forfeiture by wrongdoing has roots in equity, not reliability. *See Crawford*, 541 US at 62 ("[t]he rule of forfeiture by wrongdoing *** extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability"). Accordingly, the rule differs significantly from other hearsay exceptions that admit categories of hearsay evidence because they are considered inherently reliable.[14] For that reason, forfeiture by wrongdoing is not a "firmly-rooted hearsay exception," as the court used that phrase in *Campbell*.

---

[14] Some courts have concluded that the forfeiture doctrine, like other hearsay exceptions, is self-validating as to reliability. *See United States v. Natson*, 469 F Supp 2d 1243, 1252 (MD Ga 2006) ("If a defendant eliminates someone because he is concerned that the person may testify against him, the defendant's own conduct reveals that the defendant considers what the witness may have to say to be both relevant and reliable."). In our view, the strength of that conclusion will vary depending on the facts and circumstances of each case.

That does not end the matter, however. The state does not contend that forfeiture is a firmly rooted hearsay exception that satisfies *Campbell*. Rather, the state argues that forfeiture by wrongdoing historically has foreclosed confrontation claims on equitable grounds and that that history informs the meaning of Article I, section 11. To put the parties' arguments in perspective, we first consider the history of the forfeiture doctrine that preceded the adoption of Article I, section 11, in 1857. We then turn to what that history reveals about the meaning of Article I, section 11. *See State v. Reinke*, 354 Or 98, 106, 309 P3d 1059, *adh'd to as modified*, 354 Or 570, 316 P3d 286 (2013) (looking to the cases that preceded the adoption of constitutional provisions to determine the meaning of those provisions).

1

Forfeiture by wrongdoing arose from evidentiary procedures in seventeenth-century English felony cases. Those procedures developed out of the so-called "Marian statutes," which required magistrates to interview witnesses in felony cases before deciding whether to commit a suspect to jail or to release the suspect on bail. 1 & 2 Phil & M, c 13, § 1 (1554-55); 2 & 3 Phil & M, c 10 (1556). Among other things, the Marian statutes required that justices of the peace—and later coroners—make available to the court a record of their hearings. *Id.* It appears that witnesses at Marian proceedings were required to testify under oath. *See* Thomas Y. Davies, *Selective Originalism*, 13 Lewis & Clark L Rev 605, 619 (2009).[15] Moreover, suspects probably would have had an opportunity to cross-examine witnesses at committal hearings, but that opportunity was less likely to have been available at coroners' inquests. Robert Kry, *Forfeiture and Cross-Examination,* 13 Lewis & Clark L Rev 577, 583-84 (2009); *see* Robert Kry, *Confrontation under the Marian Statutes*, 72 Brook L Rev 493, 511-33 (2007) (inferring from the records of English Marian examinations and other sources that, by 1789, prisoners in committal proceedings would have had an opportunity to cross-examine witnesses).

---

[15] The Marian statutes themselves did not require that witnesses swear an oath before they were examined; rather, that requirement developed as courts interpreted the Marian statutes. *See* Davies, 13 Lewis & Clark L Rev at 619 (citing William Lambard, *Eirenarcha: or of the Office of the Justices of Peace* (1588)).

For obvious reasons, recorded Marian testimony became an appealing source of evidence when witnesses could not testify at trial. *See Crawford,* 541 US at 44 (citing M. Hale, 2 *Pleas of the Crown* 284 (1736)). But strict rules governed when it could be introduced. One rule was that testimony could not be read unless the Crown showed that the witness who had offered it was unavailable. *See* Kry, 13 Lewis & Clark L Rev at 579. Initially, unavailability could be proved in two ways, by showing (1) that the witness had died or (2) that the witness could not travel. In 1666, *Lord Morley's Case* articulated a third way of proving unavailability: a showing that the witness "was detained by the means or procurement of the prisoner." *See Lord Morley's Case,* 6 How St Tr 769, 770-71 (HL1666).

To put a simple point on the history, the forfeiture doctrine originated as part of the Marian unavailability rule, similar to the rules for unavailability described in OEC 804(1). Moreover, as first articulated, the doctrine appeared to be unrelated to a suspect's ability (or inability) to cross-examine witnesses at Marian examinations, a proposition that *Lord Morley's Case* illustrates. Lord Morley was tried before the House of Lords for murder. Before the trial, twelve judges advised the House of Lords on the admissibility of four Marian examinations taken during a coroner's inquest. *See Lord Morley's Case*, 6 How St Tr at 770-71. The judges ruled that three of the depositions were admissible because those witnesses were unavailable; they had died between the inquest and the criminal trial. *Id.* They also ruled that the deposition of a fourth witness would be admissible if the trier of fact found that the witness was unavailable because he had been "detained by the means or procurement of the prisoner." *Id.*

In ruling on the admissibility of the witnesses' statements, the judges in *Lord Morley's Case* did not mention whether Lord Morley had had an opportunity to confront the witnesses at the coroner's inquest. Not only is the decision silent on that point, but whether Lord Morley had had that opportunity appears to have been immaterial to whether the witnesses' statements were admissible. If Lord Morley had been able to cross-examine the witnesses at the

coroner's inquest, then any concerns about confrontation would have been satisfied, and the doctrine of forfeiture by wrongdoing would have served only as an additional way of proving unavailability. Conversely, if Lord Morley had not had the opportunity to cross-examine the witnesses at the coroner's inquest, then it is difficult to see how the doctrine of forfeiture by wrongdoing, as it was first articulated, had anything to do with confrontation. After all, the judges ruled that the testimony of three witnesses who had died after the inquest could be admitted at the later criminal trial, as well as the testimony of a fourth witnesses if Lord Morley had procured his absence from trial. Under *Lord Morley's Case*, the admissibility of all four witnesses' testimony turned only on whether they were unavailable, and forfeiture by wrongdoing served only as an additional way of proving unavailability.

That was the state of the forfeiture doctrine when it was first articulated in 1666. The Court, however, explained in *Crawford* and confirmed in *Giles* that the doctrine had taken on greater significance by 1791 when the Sixth Amendment was ratified.[16] Not only was the forfeiture doctrine a way of proving unavailability, but it also had become an equitable bar to asserting a confrontation right.

That conclusion, which the Court drew from English and American common law, rests on two premises. First, the Court concluded in *Crawford* that, when the Sixth Amendment was ratified in 1791, both the English and the American courts recognized that, as a general principle, unconfronted *ex parte* statements were not admissible in criminal trials. 541 US at 45-46. By 1791, that rule also applied to Marian examinations: If a suspect had not had the opportunity to confront a witness during a Marian examination, that statement ordinarily would not be admissible. *Id.* at 47 (relying on English cases decided shortly before 1791). Second, the Court explained in *Giles* that the English courts nevertheless had admitted unconfronted statements taken

---

[16] The Court did not acknowledge any shift in the doctrine's meaning, but it necessarily follows from a comparison of the doctrine's modest beginnings with the conclusion that the Court reached in *Crawford* and *Giles*.

during a coroner's inquest because the defendant had procured the witness's absence from the later criminal trial. 554 US at 369-70. That ruling rested, the Court explained, on the equitable principle that a defendant "'shall never be admitted to shelter himself by such evil Practices on the Witness, that being to give him Advantage of his own Wrong.'" *Id.* at 370 (quoting G. Gilbert, *Law of Evidence* 141 (1756)).

The Court's view of history in *Crawford* and *Giles* has been the subject of debate. Some commentators have reasoned that the Americans who ratified the Sixth Amendment in 1791 would have understood that *any* statement taken under oath during a Marian examination was admissible if the witness were unavailable because of death, inability to travel, or the procurement of the defendant. *See* Thomas Y. Davies, *Fictional Originalism in Crawford*, 71 Brook L Rev 105, 152 (2005).[17] It follows from that view of the history that, in 1791, Marian examinations were generally admissible if the witness was unavailable for a recognized reason and that forfeiture by wrongdoing did not serve any purpose other than to prove unavailability.

Other commentators have started from the opposite premise. *See* Kry, 13 Lewis & Clark L Rev at 579. In their view, the Americans who ratified the Sixth Amendment in 1791 would have understood that Marian examinations were admissible in later criminal proceedings only if the defendant had had the opportunity to confront the witness. *Id.*[18] It follows from that view of the history that the Sixth Amendment should permit the admission only of confronted Marian examinations and that forfeiture by wrongdoing should not be viewed as excusing the need for confrontation.

---

[17] That view rests on the proposition that the English cases excluding unconfronted statements taken during Marian examinations, which the Court had cited in *Crawford*, were decided shortly before the Sixth Amendment was ratified and would not have been known in this country by that time. Davies, 71 Brook L Rev at 153-62.

[18] One exponent of that view acknowledges that, even though confrontation ordinarily was available in committal hearings, the opportunity usually was not available in coroners' inquests. Kry, 13 Lewis & Clark L Rev at 583-84. Kry relies on a justification advanced by some later English treatises—that a constructive opportunity for cross-examination existed because the fact of a coroner's inquest would have been widely known—to explain the admission of unconfronted examinations taken during a coroner's inquest. *See id.*

Even though both views of history start from different premises, they share the same view of forfeiture by wrongdoing: In 1791, it would have been understood only as another way of proving unavailability. Again, the Court took a middle position in *Crawford* and *Giles*, finding that by 1791 the doctrine of forfeiture by wrongdoing had become an equitable bar to asserting a confrontation claim under both the common law and the Sixth Amendment.

We need not weigh in on that debate to resolve the meaning of Article I, section 11. Whatever the state of the common law may have been in England and whatever Americans may have understood about English common law when they ratified the Sixth Amendment in 1791, the question in this case is what was the state of the law in America in 1857 when Article I, section 11, was adopted. We accordingly turn to the American cases that preceded and closely followed the adoption of our constitutional provision.

2

In America, one aspect of the common law had become settled by 1857: Unconfronted statements taken during Marian examinations were not admissible in later criminal proceedings. *State v. Campbell*, 30 SCL (1 Rich) 124, 125 (1844) (coroner's inquest); *State v. Hill*, 20 SCL (2 Hill) 607, 610-11 (1835) (committal hearing); *see State v. Houser*, 26 Mo 431, 436-38 (1858) (affirming general rule and excluding the statement because the state had failed to prove that the witness was unavailable); *cf. State v. McO'Blennis*, 24 Mo 402 (1857) (holding that confronted statements taken during a committal hearing were admissible when the witness had died before the criminal trial). For example, in *Campbell* and also in *Hill*, the witness had died between the time he or she had testified at the Marian examination and the defendant's trial.[19] *Campbell*, 30 SCL at 124; *Hill*, 20 SCL at 607-08. Neither defendant had had the opportunity to cross-examine the witness at the Marian examination and, in each case, the court excluded the witness's statement for that reason. *Campbell*, 30 SCL at 125; *Hill*, 20 SCL at 610-11.

---

[19] Both cases arose in South Carolina, which had adopted the Marian statutes. *See Hill*, 20 SCL at 608.

Those cases expressly rejected the rule recognized in some earlier English authorities that statements taken under oath in the course of a Marian examination were admissible whenever the witness was unavailable. *Campbell*, 30 SCL at 124-25; *Hill*, 20 SCL at 610-11.[20] The court explained in *Hill* why it did not view the presence of an oath as sufficient: "[H]owever much inclined the witness may be to speak the truth, and the magistrate to do his duty in taking the examination, [the witness's] evidence will receive a coloring in proportion to the degree of excitement under which he labors." 20 SCL at 610-11. The courts accordingly rejected the proposition that the oath was a sufficient guarantee of reliability and concluded instead that the opportunity for cross-examination was the necessary prerequisite for admitting the testimony in a later criminal case. *Id.*; *accord Campbell*, 30 SCL at 124-25.

In *Hill*, *Campbell*, *Houser*, and *McO'Blennis*, the defendants had not procured the witnesses' absence from the later criminal trials. Accordingly, none of those cases had occasion to consider the doctrine of forfeiture by wrongdoing or decide whether the application of that doctrine would result in the admission of the witness's statements. However, two cases that bracketed the adoption of the Oregon Constitution identified the equitable principle underlying the forfeiture doctrine as a bar to asserting a confrontation claim; that is, they explained that a defendant who purposefully keeps a witness away from trial cannot object to the admission of the witness's statements on the ground that the defendant cannot confront the witness at trial.

In 1856, the Georgia Supreme Court explained that the doctrine of forfeiture by wrongdoing would lead to the admission of a witness's examination before the committing

---

[20] The court discussed that earlier line of English authority in *Houser*:

"It is true that there may be a few cases in which depositions, taken before coroners in England without any opportunity of cross-examination, have been used against the accused, where the witness subsequently died; but the authority of such cases is questioned, even in that country, by their ablest writers on common law—Starkie, Roscoe, Russell—and it is doubtful whether such testimony would now be received. At all events, such testimony has never been permitted in this country[.]"

26 Mo at 436.

magistrate. *See Williams v. Georgia*, 19 Ga 402, 402-03 (1856). The court began its analysis by citing *Lord Morley's Case* for the broad proposition that, if "any witness who had been examined by the Crown, and was then absent [because] *** the witness was detained by means or procurement of the prisoner, then the examination should be read." *Id.* at 403. After concluding that the state had failed to lay a sufficient foundation for the admission of the evidence under the forfeiture doctrine, the court added in *dicta* that it did not think that the Sixth Amendment confrontation right "ha[d] any bearing upon this point." *Id.* As we understand the court's reasoning, which was admittedly brief, it concluded that the Sixth Amendment was not intended to "disturb any great rule of criminal evidence," such as the doctrine of forfeiture by wrongdoing. *See id.*

Approximately 20 years later, the United States Supreme Court clarified what the Georgia Supreme Court had intimated in *Williams*. *See Reynolds v. United States,* 98 US 145, 25 L Ed 244 (1878). One of the questions in *Reynolds* was whether a witness's testimony from the defendant's earlier criminal trial could be admitted at a later trial for the same offense. The district court had found that the defendant had procured the witness's absence from the later trial, and the Court explained that the defendant's actions barred him from raising any objection on confrontation grounds. The Court reasoned:

> "The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by [the accused's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated."

*Id.* at 158.

Having concluded that a defendant who prevents a witness from testifying cannot object on confrontation grounds to admitting the witness's prior statements, the Court turned to the question whether the "evidence [in that case had been] supplied in some lawful way." Specifically, the Court turned "to the consideration of what the former testimony was, and the evidence by which it was proven to the jury." *Id.* at 160.

The defendant in *Reynolds* had challenged the means by which the government had proved the missing witness's former testimony,[21] and the Court relied on a civil evidence treatise that explained when former testimony was admissible as an exception to the rule against hearsay. *See id.* at 161 (citing Francis Wharton, 1 *A Commentary on the Law of Evidence in Civil Issues* § 177 (1877)). The treatise noted that former testimony could be proved by persons who had heard the witness's testimony, and it explained that

> "[t]he admission of such evidence is based on the fact that the party against whom the evidence is offered, having had the power to cross-examine on the former trial, and the parties and issue being the same, the second suit is virtually a continuation of the first."

Wharton, 1 *Evidence* § 177 at 180. Citing section 177 of Wharton's treatise, the Court noted that the testimony had been given at the defendant's trial on the same offense, that it was substantially the same as that given in the earlier trial, and that defendant had been present and had had "full opportunity of cross-examination." 98 US at 160-61. The Court concluded, "This brings the case clearly within the well-established rules. The cases are fully cited in 1 Whart. Evid., sect. 177." *Id.* at 161.

---

[21] The Court explained that the defendant had argued that, not only had the government failed to prove that he had procured the missing witness's absence but that a

"witness Patterson was allowed to read from a paper what purported to be statements made by [the missing witness] on a former trial. No proof was offered as to the genuineness of the paper or its origin, nor did the witness testify to its contents of his own knowledge."

98 US at 152 (summarizing the defendant's argument).

The Court's opinion in *Reynolds* divides into two parts. When the Court addressed the defendant's constitutional objections to the admission of the testimony, it concluded broadly that the equitable principles underlying the forfeiture doctrine foreclosed the defendant from objecting to the admission of the testimony on confrontation grounds. When the Court turned to the defendant's evidentiary objections to the admission of the witness's former testimony, it relied on a treatise governing the admission of evidence in civil proceedings to conclude that the trial court's ruling was "clearly within well-established rules." To be sure, as the Court noted, the statements at issue in *Reynolds* had been subject to cross-examination in the defendant's first trial. However, that consideration appears to have factored into the Court's analysis only in resolving the defendant's evidentiary objections to the admission of the evidence. Not only did the Court resolve the defendant's Sixth Amendment claims solely by reference to the equitable principles underlying the forfeiture doctrine, but any other reading of the case would require us to assume that the Court looked to a treatise on the admission of evidence in civil cases to determine the scope of a defendant's constitutional rights in criminal trials. We decline to draw that conclusion.

3

With that background in mind, we turn to defendant's state constitutional argument. Defendant advances two separate arguments. His first argument is based on the common law. Defendant acknowledges that the common-law doctrine of forfeiture by wrongdoing excused the need for confrontation. He contends, however, that the common-law forfeiture doctrine applied only if the statements admitted under that doctrine had an independent guarantee of reliability, and he points to the fact that, at common law, statements taken during a Marian examination would have been taken under oath. In his view, the presence of an oath was evidence that, at common law, the doctrine of forfeiture by wrongdoing required an irreducible minimum guarantee of reliability before an *ex parte* statement could be admitted. He reasons that Article I, section 11, demands no less.

Before turning to defendant's reliability argument, we note our agreement with the premise of his argument.

For the reasons set out above, we agree with defendant that, by 1857, the equitable principle underlying the doctrine of forfeiture by wrongdoing served as a bar to asserting a common-law confrontation right. The framers of Oregon's constitution accordingly would have understood that, at common law, a defendant who engaged in wrongdoing for the purpose of making a witness unavailable could not complain that the witness's prior statements were admissible without the defendant having the opportunity to meet the witness "face to face." We are also persuaded that, in adopting Article I, section 11, the framers of Oregon's constitution would have accepted that limitation on an accused's state constitutional right to meet the witnesses face to face.

As we understand defendant's argument, it rests on the proposition that a defendant who gives up his or her Article I, section 11, right to confrontation nonetheless retains an Article I, section 11, right to demand that only reliable evidence be admitted. The right that defendant perceives is not apparent from the text of Article I, section 11. Article I, section 11, provides that, in all criminal prosecutions, "the accused shall have the right *** to meet the witnesses face to face." Textually, the right to confrontation is "a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *See Crawford*, 541 US at 61 (explaining the textually analogous federal right). To put the matter differently, if a defendant is able to "meet the witnesses face to face," as Article I, section 11, requires, then nothing in the text of that provision provides a basis for making the further objection that the witnesses' confronted testimony is nonetheless unreliable and thus inadmissible under Article I, section 11.

To be sure, this court held in *Campbell* that Article I, section 11, does not preclude the admission of unconfronted hearsay statements if the declarant is unavailable and if the statements either come within a firmly rooted hearsay exception or have particularized guarantees of trustworthiness. *See* 299 Or at 648 (adopting that standard from *Roberts*, 448 US at 66-67). *Campbell*, however, stands only for the proposition that the procedural right guaranteed by

the text of Article I, section 11, can be satisfied if hearsay evidence possesses certain indicia of reliability. In effect, *Campbell* recognizes that, in some circumstances, reliability can serve as a proxy for the procedural right to meet the witnesses face to face. But *Campbell* neither holds nor suggests that, in addition to guaranteeing that procedural right, Article I, section 11, also requires a separate inquiry into reliability. That requirement is not found either in the text of the constitutional provision or in *Campbell*.

The common-law context against which Article I, section 11, was adopted also cuts against reading a separate reliability requirement into that provision. When Article I, section 11, was adopted in 1857, the settled American rule was that unconfronted, sworn statements taken during a coroner's inquest or committal proceeding were not admissible in a later criminal trial, even when the witness was unavailable. *See, e.g.*, *Houser*, 26 Mo at 436; *Campbell*, 30 SCL at 125; *Hill*, 20 SCL at 610-11. Given that history, the oath appears to have been a procedural incident of a Marian examination to which early and mid-nineteenth century American courts attached no independent significance, at least in giving effect to a defendant's common-law confrontation right. That common-law context provides no basis for finding in the procedural right to confrontation a separate substantive requirement of evidentiary reliability.

We note, finally, that no direct evidence exists of what the people who framed the Oregon Constitution thought about the right to confrontation. Article I, section 11, was adopted without comment or debate. *See* Claudia Burton & Andrew Grade, *A Legislative History of the Oregon Constitution of 1857 - Part I (Articles I & II)*, 37 Willamette L Rev 469, 518 (2001). The framers more or less grafted the provision onto Oregon's constitution without explaining how they understood its scope or application. *See Copeland*, 353 Or at 827. And they never suggested any understanding that the doctrine of forfeiture by wrongdoing would require a separate inquiry into evidentiary reliability. Nothing in the history of the enactment of Article I, section 11, calls into question what the text of Article I, section 11, says and what its context confirms: If a defendant forfeits the right to meet a witness face to face, Article I, section 11, does not

require that any evidence admitted under the forfeiture doc-
trine possess independent guarantees of reliability.[22]

Having reached that conclusion, we recognize that
other sources of law provide some assurance against the
admission of unreliable evidence. As the trial court observed,
rules of evidence, such as OEC 401 and OEC 403, "articulate
minimum standards of reliability." *See Lawson/James*, 352
Or at 750-51 (so stating). Moreover, the Due Process Clause
is a bar to the admission of unreliable evidence. *Perry v. New
Hampshire*, ___ US ___, 132 S Ct 716, 723, 181 L Ed 2d 694
(2012) (defining when evidence will be so unreliable that
its admission violates due process). Finally, as some legis-
lators observed, if OEC 804(3)(g) results in the admission
of unacceptable levels of unreliable evidence, the legislature
can always act to correct that problem. Article I, section 11,
however, does not provide a substantive guarantee against
the admission of unreliable evidence, as defendant argues.

We conclude that, when a defendant has intention-
ally made a witness unavailable to testify, the defendant loses
the right to object that that evidence should not be admitted
on state constitutional confrontation grounds. The defen-
dant's act ensures that the witness's testimony can never
be subject to "testing in the crucible of cross-examination."
*Crawford*, 541 US at 61. In other words, where a defen-
dant acts wrongfully to make a witness unavailable, that
defendant largely controls the very feature of the evidence
to which he objects. The principle of forfeiture by wrong-
doing, as its history shows, ensures that a defendant cannot
manipulate proceedings in that way. It likewise establishes
that, if a defendant attempts that kind of manipulation, he
or she cannot evade its consequences.

---

[22] Defendant cites some cases suggesting that forfeiture *as a hearsay excep-
tion* requires a consideration of reliability. *See, e.g.*, *Vasquez v. People*, 173 P3d
1099, 1106 (Colo 2007) (recognizing forfeiture by wrongdoing as an exception
to hearsay under the Colorado's residual exception and therefore requiring an
inquiry into reliability). We accept defendant's point that several jurisdictions
adopted forfeiture-by-wrongdoing as part of that jurisdiction's "catchall" hearsay
exception and that "catchall" exceptions generally require that the evidence be
reliable. As the United States Supreme Court has observed, however, the hearsay
doctrine is not coextensive with the confrontation right. State and federal legisla-
tures may make hearsay rules more protective of a defendant's rights than state
and federal confrontation rules do.

Defendant advances a second state constitutional argument. He contends that he can lose his confrontation rights under Article I, section 11, only if he knowingly and intentionally relinquishes them. In defendant's view, there must either be a colloquy on the record followed by a knowing and intentional waiver of his confrontation rights or an admonition by the court that further conduct will result in the loss of his confrontation rights. We need not explore the intricacies of the question that defendant raises. In this case, the answer is straightforward. As explained above, the framers of Oregon's constitution would have understood that forfeiture by wrongdoing extinguishes a defendant's state constitutional right to confront a witness whom the defendant has purposefully kept away from the proceeding. It necessarily follows that proof that the doctrine of forfeiture by wrongdoing applies is sufficient to eliminate the right. No more is required.

IV

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." *Crawford* established, as a general rule, that testimonial hearsay is not admissible in a defendant's criminal trial unless the defendant either previously had or currently has the opportunity to confront the declarant. 541 US at 53-54. The only exceptions to that federal confrontation right are those "established at the time of the founding." *Id.* at 54. One of those exceptions is the common-law doctrine of forfeiture by wrongdoing. For that doctrine to apply, the defendant must have engaged in wrongful conduct designed or intended to prevent the witness from testifying and, by such wrongful conduct, must have actually prevented the testimony. *See Giles,* 554 US at 361-62.

The state does not dispute that the hearsay statements that the trial court admitted are testimonial, nor does it contend that defendant had the ability to cross-examine his wife regarding some of those statements.[23] We assume,

---

[23] Because defendant could have requested a hearing to challenge the allegations his wife made in seeking a restraining order, there is a question whether he

therefore, that the Sixth Amendment would prohibit the use of those statements unless an exception applies. As explained above, the trial court found that the wife's statements were admissible under the doctrine of the forfeiture by wrongdoing. Defendant's only argument to the contrary mirrors his arguments under the common law and Article I, section 11. He reasons that the Sixth Amendment requires that statements admitted under the forfeiture doctrine have independent guarantees of reliability.

Defendant's argument is difficult to square with *Crawford*. The Court made clear in *Crawford* that the Sixth Amendment Confrontation Clause does not require a separate inquiry into reliability. As the Court explained, the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 US at 61. Moreover, the Court stated that, when forfeiture by wrongdoing applies, concerns regarding reliability are not a matter of constitutional concern: "[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; *it does not purport to be an alternative means of determining reliability*." *Id.* at 62 (emphasis added). Indeed, Justice Souter's concurrence in *Giles* recognized that it is "reasonable to place the risk of untruth in an unconfronted, out-of-court statement on a defendant who meant to preclude the testing that confrontation provides." *Giles*, 554 US at 379. Given *Crawford* and *Giles*, we cannot accept defendant's argument that the Sixth Amendment requires a separate inquiry into reliability.

V

Defendant argues that, even if admitting his wife's statements under OEC 804(3)(g) did not violate his rights under Article I, section 11, and the Sixth Amendment, it violated his right to due process under the Fourteenth Amendment to the United States Constitution. Defendant starts from the premise that the Due Process Clause guarantees that the evidence on which he is convicted must meet

---

had an opportunity to cross-examine her regarding those allegations. However, there is no dispute that he lacked a prior opportunity to cross-examine her regarding the statements made in the notes she had prepared for her lawyer.

minimum standards of reliability. He concludes that his wife's statements did not meet those standards because the statements were made in anticipation of litigation.

The United States Supreme Court recently reaffirmed that some evidence is so unreliable that it violates the Due Process Clause. It reaches that level when it "'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *See Perry*, 132 S Ct at 723 (quoting *Dowling v. United States*, 493 US 342, 352, 110 S Ct 668, 107 L Ed 2d 708 (1990)). Examples include the knowing use of false evidence or perjured testimony. *Napue v. Illinois*, 360 US 264, 269, 79 S Ct 1173, 3 L Ed 2d 1217 (1959) (false evidence); *Mooney v. Holohan*, 294 US 103, 112, 55 S Ct 340, 79 L Ed 791 (1935) (perjured testimony). They also include the use of evidence "tainted by police arrangement," *Perry*, 132 S Ct at 724 (describing *Manson v. Brathwaite*, 432 US 98, 97 S Ct 2243, 53 L Ed 2d 140 (1977)).

Defendant does not argue that his deceased wife's statements come within any of the categories of evidence that the Court previously has recognized are so unreliable that their admission violates due process. Rather, defendant argues that the admission of his wife's statements violates due process because he "lacked one of his critical procedural mechanisms for challenging unreliable evidence"—namely, cross-examination. To the extent that defendant's inability to cross-examine his wife is the crux of his due process argument, it suffers from three problems. First, defendant can hardly complain that he cannot cross-examine his wife when he purposefully made her unavailable to testify. The second problem is related to the first; if defendant is correct, his interpretation of the Due Process Clause would negate the exception to the Sixth Amendment that the Court recognized in *Crawford* and reaffirmed in *Giles*. Third, defendant was always free to argue to the jury that it should discount his wife's statements because they were made in anticipation of litigation, even if he could not cross-examine her on that point. *See Perry*, 132 S Ct at 722 (explaining that the constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording

the defendant means to persuade the jury that the evidence should be discounted”).

Beyond noting his inability to cross-examine his wife, defendant provides no reason to think that the statements his wife made in anticipation of litigation are so unreliable that their admission violates due process. *See, e.g.*, *Albrecht v. Horn*, 485 F3d 103, 135 (3d Cir 2007) (holding that out-of-court statements to an attorney were sufficiently reliable in part because the client knew that the statements would have to be proved at trial). We conclude that, the trial court did not err in admitting, over defendant's statutory and constitutional objections, some of the statements that his wife made before her death.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.