Submitted February 12, 2019; in Case Nos. 15CR54291 and 16CR47326, reversed and remanded; in Case No. 15CR19090, affirmed January 21, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTOPHER A. CECCONI,
aka Christopher Angelo Cecconi,
*Defendant-Appellant.*

Multnomah County Circuit Court
15CR19090, 15CR54291, 16CR47326;
A164297 (Control), A164298, A164299

480 P3d 953

In this consolidated criminal appeal, defendant appeals a judgment of conviction for felony assault in the fourth degree-constituting domestic violence, ORS 163.160(3) and ORS 132.586; assault in the fourth degree, ORS 163.160; harassment, ORS 166.065; and criminal mischief in the second degree, ORS 164.354 pursuant to a conditional guilty plea and argues that the trial court erred in admitting evidence under various hearsay exceptions and in concluding that the state established the declarant, J's, unavailability. Defendant also appeals two probation revocation cases and argues that, if he prevails on his evidentiary-hearsay claim, those revocations should be reversed and remanded because the trial court considered his conditional guilty plea in revoking probation in those cases. *Held*: In light of *State v. Iseli*, 366 Or 151, 162, 458 P3d 653 (2020), the trial court erred in admitting the hearsay evidence because the state did not establish that J was unavailable. The Court of Appeals also reversed and remanded one of defendant's probation revocations because that revocation resulted solely from defendant's conditional guilty plea.

In Case Nos. 15CR54291 and 16CR47326, reversed and remanded. In Case No. 15CR19090, affirmed.

Jerry B. Hodson, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Daniel C. Bennett, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jennifer S. Lloyd, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Aoyagi, Judge.

EGAN, C. J.

In Case Nos. 15CR54291 and 16CR47326, reversed and remanded. In Case No. 15CR19090, affirmed.

**EGAN, C. J.**

Defendant was charged with felony assault in the fourth degree-constituting domestic violence, ORS 163.160(3) and ORS 132.586; assault in the fourth degree, ORS 163.160; harassment, ORS 166.065; and criminal mischief in the second degree, ORS 164.354, in association with an alleged attack on J, the mother of his child. Defendant entered a conditional guilty plea to those charges after the trial court ruled that the state would be allowed to introduce hearsay evidence (consisting of J's testimony relating to a probation violation hearing) under OEC 804(3)(a), the former testimony exception to the rule against hearsay, and OEC 804(3)(g), the forfeiture-by-wrongdoing exception. After defendant entered that guilty plea, the court revoked his probation in two other cases based, in part, on the new criminal convictions. Defendant appeals both the judgment of convictions (16CR47326) and the probation revocation judgments in the other two cases (15CR19090 and 15CR54291).[1] We conclude that the court erred in deeming the hearsay evidence as admissible because the state did not establish that J was "unavailable," as required by both OEC 804(3)(a) and OEC 804(3)(g). Accordingly, we reverse and remand Case No. 16CR47326 so that defendant may have the opportunity to withdraw his plea, if he so chooses. As to defendant's probation revocation judgments, we reverse and remand Case No. 15CR54291 and affirm Case No. 15CR19090.

The underlying facts are undisputed, except where otherwise noted. The events that gave rise to defendant's new convictions occurred on July 31, 2016. Prior to that date, defendant had been convicted of previous crimes against J, and he was on probation for those convictions.[2]

---

[1] The trial court also decided that a subset of the evidence would be admissible under OEC 803(26), the 24-hour domestic violence hearsay exception. Defendant does not challenge the court's decision about the admissibility of hearsay under that exception. Thus, our discussion and disposition are limited to the court's erroneous ruling as it pertains to OEC 804, and we omit any further discussion of OEC 803(26), as it is not relevant to our conclusion.

[2] In Case No. 15CR19090, defendant pleaded guilty to harassment and was sentenced to domestic violence diversion. In Case No. 15CR54291, defendant pleaded guilty to burglary in the first degree-constituting domestic violence, felony assault in the fourth degree-constituting domestic violence, assault in the fourth degree, and menacing-constituting domestic violence. Defendant was

Defendant, who had recently been released from jail, agreed to meet J in a parking lot to give her money for their son's birthday party. J went with two friends and was waiting for defendant in the backseat of the vehicle when—before she realized that defendant had arrived—defendant opened the door and started hitting and kicking her. J could not escape the attack because there were items that prevented her from reaching the door on the other side of the backseat. Defendant hit J "[a]nywhere he could pretty much punch." Defendant stopped attacking J, and then turned his attention towards her friends sitting in the front seat. At that point, J got out of the car and began calling for help.

J ran to a passing car and asked the driver to call the police. Defendant, who had chased after J, began hitting the driver of the passing vehicle and tried to take the driver's phone. Finally, another passerby intervened and restrained defendant on the ground until the police arrived. As a consequence of defendant's actions, J suffered a black eye and a "busted" lip, and she had to miss work for three days.

Defendant was arrested the same day and was indicted on August 8, 2016. His trial was initially scheduled for September 20. About two weeks before that scheduled trial date, the trial court held a probation violation hearing to consider an allegation that defendant had violated a no-contact order that was associated with one of his two previous convictions for crimes against J. J appeared at the probation violation hearing and testified under oath to the events that occurred on July 31.

At defendant's request, trial was rescheduled for November 28. On November 23, the state and defendant, with his defense attorney, appeared at "trial call." The state, believing that J was not going to appear for trial, affirmed that it was ready to proceed for trial, and requested the court to hear a pretrial motion regarding hearsay evidence that it sought to admit. The court held a hearing on the state's motion on November 28—the same day set for trial.

originally sentenced to a downward dispositional departure of five years of supervised probation. However, after his probation was revoked, he was resentenced to five years of incarceration.

The state called several witnesses in support of its position that J's hearsay statements were admissible. The state's first witness was a victim advocate, who had worked with J in relation to defendant's case. The victim advocate stated that she had had several conversations with J, and noted that J was hesitant to testify because she "felt like she had already testified at the [probation violation] hearing" and that she was "nervous about the amount of time that [defendant] might have to serve." J had also told the victim advocate that she "felt as though [the state] had already had a case that had gone through, and [the attack] had still happened again." That is, even though J "had the no-contact order" against defendant, that "had not stopped him from contacting her."

Further, on two separate occasions, J had told the victim advocate that she was not going to testify at defendant's trial. The state offered to provide transportation and childcare to J, which did not alleviate her unwillingness to appear. By the end of October, J had stopped answering her phone. Nevertheless, the victim advocate continued to call and leave voicemails for J to ensure that she knew when the trial was to occur.

The state also provided testimony from a subpoena clerk along with records supporting the efforts made by the subpoena clerk to secure J's testimony for trial. Prior to the first trial date that had been set for September 20, the state had used an investigator in an attempt to contact and serve J with a subpoena to require her appearance at trial. On five different occasions—August 2 and 31 and September 1, 2, and 6—an investigator went to J's house to serve her, but she did not answer the door. On August 2, the investigator left a subpoena on her front door. On September 6, the investigator personally served J with a subpoena to appear at the date initially set for trial—September 20. However, as noted above, defendant requested, and was granted, a continuance. After the trial was set over to November 28, the state attempted to personally serve J again on October 4 and 5. On both of those dates, an investigator surveilled J's house for 30 minutes but was unable to make contact with her. On October 6, J was personally served. Additionally, a copy of J's subpoena was mailed via "certified return-receipt

request" to J notifying her of the trial date, which was received, signed, and returned by J's mother. However, at the time the state received the certified return receipt on November 10, the state believed that it was from J.

Finally, the state offered evidence of recordings of over 20 jail calls between defendant and J and played three of those calls for the court. The first two calls occurred on August 2. In a portion of the first call between defendant and J, defendant stated what he planned on doing to J the next time he saw her:

"[DEFENDANT]: ***. Well, it don't matter, nigger. Period. You already know why, because (indiscernible) dumb shit. But I'll do it again, too. I don't give a fuck.

"[J]: Are you serious?

"[DEFENDANT]: (Indiscernible) if you don't want that to happen to you, then don't—then, leave me alone, because if—because any of my bitches want to act out of line, they're getting slapped, fucked, taken that head, whatever. It don't matter.

"[J]: So if you see me again, you're going to do it again?

"[DEFENDANT]: I don't—If I seen you right now this second, I would do it again, yeah.

"[J]: Do you not listen to how crazy you sound?

"[DEFENDANT]: And I'll probably—by the time whenever I get out, whether—I don't know, months, years, whatever, probably by the time I get out and after I hear about everything you been doing, I probably would do it again, so, yeah. You probably should just leave me alone. Probably do it way worse, too, somewhere where no's going to stop nothing, somewhere where we're in close, some-where where I'm going to whoop your ass. Bad."

In the second call, defendant worked to convince J to not testify by telling her that, if she did not testify, it is likely that he would be released. The conversation went, in part:

"[DEFENDANT]: Are you going to court?

"[J]: Probably.

"[DEFENDANT]: Why?

"[J]:    Why would I not?

"[DEFENDANT]:  All right, then, maybe just don't talk to me, bro. I'm not going to talk to you no more—

"* * * * *

"[DEFENDANT]:  Don't matter. I have the right— that's law, I have the right to face my accuser, nigger. If my accuser don't come, it's the law that I don't go to jail. If I shoot someone in the face, and there's 50 witnesses and the person I shot in the face don't come, I don't come—it's just harder to drop. Niggers get shot all the time—

"* * * * *

"[J]:    If I don't press charges you get to go out—

"* * * * *

"[DEFENDANT]:  Yeah, but—but you have to help the D.A. for them to press charges. You have to work with them."

Finally, the third call played by the state took place on September 30, 2016, after the probation violation hearing at which J had testified. Defendant asked J, "What are you going to do on Sunday?" J replied that she was "staying at [her] sister's house." Defendant also stated that he had hoped that J would not go to the trial. J replied that she was "not going."

After the state presented its evidence, it argued that J's statements would be admissible at trial under OEC 804(3)(a), the former-testimony exception to the rule against hearsay, and OEC 804(3)(g), the forfeiture-by-wrongdoing exception. Defendant argued that the state had not met its burden under OEC 804(3)(a) and OEC 804(3)(g)—both of which require the proponent of the evidence to establish the declarant's unavailability—to establish that J was "unavailable." Specifically, defendant argued that, for J to be "unavailable," either a continuation of the trial or a material witness warrant was necessary, because J was a reluctant witness. The state responded by reiterating everything it had done, including its personal service of subpoenas, mailing a "certified return-receipt request," surveillance of J, and phone calls to J from the victim advocate for the purpose of obtaining J's presence. The state argued that all of those

efforts were sufficient to meet its burden because, viewed in totality, those efforts constituted "reasonable and good-faith efforts." Additionally, the state argued that, because J had told defendant in the jail calls that she would not show up to trial and not be at home, any effort to procure her would be "futile."

The trial court found that J was unavailable because the state made "reasonable good-faith efforts to secure her voluntary appearance at trial." Specifically, the court stated that J was unavailable

> "based on the efforts by the DA's office to bring her to court, and coupled—that the subpoenas, coupled with the phone calls, coupled with both mailing and return receipts and going out to surveil her residence, and coupled with the phone calls which I regard for two purposes: one, that the victim makes clear, she's not going to be at home and she's not going to come to trial. So she is refusing to come in."

The court did not address whether the state was required to seek a continuance; however, it did conclude that a material witness warrant was not required because the law does not require "the DA's office to actually go out and apprehend victims in every case; there could be certain cases where it would be required for unavailability. But certainly it cannot be that in every case the DA's office has to have the victim[] arrested." Additionally, the court concluded that the forfeiture-by-wrongdoing exception applies because defendant "intentionally *** engaged in conduct" that resulted in J's unavailability. Looking at the totality of the circumstances, including defendant's history of violence toward J, the trial court found that the "phone calls were veiled threats that if she appeared, that would be problematic for her, and she would suffer consequences because he would be suffering consequences." Based on those findings and conclusions, the court determined that J's former testimony given during defendant's probation violation hearing would be admissible at trial. After the pretrial hearing concluded, defendant conditionally pleaded guilty to all four counts and then initiated this appeal.

On appeal, defendant reprises his arguments. First, defendant challenges the admission of the testimony

under OEC 804(3)(a), the former testimony exception and OEC 804(3)(g), the forfeiture-by-wrongdoing exception. In doing so, defendant asserts that J was not "unavailable" as required by either exception to the hearsay rule.[3] Next, defendant argues that, even if J was "unavailable," defendant did not "forfeit his right to the witness's presence via his wrongdoing," and, therefore, the forfeiture-by-wrongdoing exception does not apply.

In evaluating a trial court's determination that a witness is unavailable, we review the trial court's determination of "'unavailability' under OEC 804(1)(e) as a question of law." *State v. Iseli*, 366 Or 151, 162, 458 P3d 653 (2020). "[A]ny fact that the trial court found is binding, if supported by any evidence in the record." *Id.* at 159. Those include "historical facts about events that occurred, together with facts about the nature and underlying intent of defendant's conduct toward the victim." *Id.*

OEC 804(1)(e) states, in part, that a person is unavailable if the declarant "[i]s absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." Although the "'process'

_____

[3] Defendant also argues that admitting J's statements are a violation of his Article I, section 11, right to "meet the witness face to face." Nevertheless, in arguing that J was unavailable pursuant to OEC 804, he asserts that the statutory and constitutional frameworks for determining whether a declarant is "unavailable," do not appear to differ in any meaningful way. Thus, in arguing that J was unavailable, defendant cites *State v. Harris*, 362 Or 55, 57, 404 P3d 926 (2017), for the proposition that, "to establish unavailability for Article I, section 11, purposes, the state must show that it is unable to produce a witness after exhausting reasonable means of doing so." In response, the state asserts that the test under OEC 804 "is not as stringent as the constitutional standard." Specifically, the state asserts that there is no "'exhaustion' requirement like that under Article I, section 11." We have noted that "[w]hat is needed to establish unavailability" to overcome Article I, section 11, or OEC 804 requirements are "not necessarily the same," *State v. Belden*, 303 Or App 438, 445, 464 P3d 465, *rev allowed*, 303 Or App 438 (2020); however, we need not address any differences here, as our resolution of the question under the evidence code is dispositive. *See, e.g.*, *Dept. of Rev. v. River's Edge Investments, LLC*, 359 Or 822, 836, 377 P3d 540 (2016) (stating that, as a prudential matter, we address statutory challenges before reaching constitutional issues to resolve the case on the narrowest ground possible; citing Wallace P. Carson, Jr., *"Last Things Last": A Methodological Approach to Legal Argument in State Courts*, 19 Willamette L Rev 641, 643-45, 654 (1983) (advocating for a legal analysis in sequence beginning with administrative rules, then state statutes, then state constitution, then federal law, then federal constitution)).

and 'other reasonable means' components are set out alternatively in OEC 804(1)(e), they operate collectively." *Iseli*, 366 Or at 173. Meaning that "showing 'process' via service of a subpoena may not necessarily satisfy the legislature's intended criteria for establishing a nonattending declarant's unavailability." *Id*. Rather, a proponent may still "need to establish 'unavailability' by showing pursuit of 'other reasonable means.'" *Id*. (quoting OEC 804(1)(e)). In determining what, if any, further efforts are required, the totality of the circumstances guides our analysis. *Id*. Factors that we consider include

> "the proponent's efforts to procure the declarant's attendance beyond service of a subpoena; the resources available to the proponent; available options that the proponent did not pursue; any limit on the proponent's efforts, and the likelihood that additional efforts would procure attendance[;] *** the importance of declarant's testimony[;] the cost of procuring the declarant[;] *** the stakes of the case[; and the] wrongful conduct by another [that] may have caused the nonattendance."

*Id*.

The parties do not dispute, and we agree, that the state's personal service of a subpoena on October 6, 2016, for the November 28, 2016, trial date was adequate in this case to meet the process requirement. Thus, we limit our discussion to the sole issue of whether the state was required to engage in further efforts to secure J's appearance at trial to satisfy the "other reasonable means" requirement.[4]

One factor weighs significantly against defendant—his wrongful conduct that, as we discuss below, played a significant role in preventing J's attendance.[5] The trial court,

---

[4] Although the state argued below that any further efforts to secure J's attendance at trial would be "futile," and the trial court appeared to agree, the state does not develop an argument on appeal in regard to the futility of taking additional steps. Rather, the state takes the position that it met its burden to establish that J was unavailable because it had taken "reasonable" steps "in light of defendant's conduct." Accordingly, we do not address whether further efforts would be futile. *See Bazzazz v. Howe*, 262 Or App 519, 528-29, 325 P3d 775, *rev den*, 356 Or 397 (2014) (declining to address an undeveloped argument).

[5] The state argues that, "because of defendant's direct involvement in the victim's decision not to appear[,] defendant cannot now challenge the reasonableness of the state's efforts." The state relies on *State v. Supanchick*, 354 Or 737,

looking at the totality of the circumstances, found that defendant caused J to not attend trial. The court stated that, because of defendant's history of violence toward J along with the "phone calls [that] were veiled threats that if she appeared, that would be problematic for her, and she would suffer consequences because he would be suffering consequences." Those findings are supported by the underlying fact that, when J asked whether defendant would attack her again, he said, "if I seen you right now this second, I would do it again, yeah," in conjunction with defendant's history of physical abuse toward J, which gave those threats heightened credibility. *See Iseli*, 366 Or at 173 (clarifying that a defendant's wrongful conduct that may have caused the nonattendance of a declarant is a factor to be considered in weighing whether a declarant is "unavailable" under OEC 804).

Although defendant acted in a way to prevent J's attendance, we must consider the totality of the circumstances in determining whether the state should have pursued "other reasonable means"—like seeking a continuance—to obtain J's testimony at trial. *Id.* In considering the circumstances, we conclude that several factors weigh against the state: (1) the available options that the state did not pursue; (2) the likelihood that additional efforts would procure attendance; and (3) the importance of J's testimony. Defendant, in arguing that the state did not make reasonable efforts, asserts that the state could have taken further reasonable efforts to "procure" J's attendance; for instance, the state should have "sought a continuance."[6] In light of *Iseli*, we conclude that the trial court's conclusion that J was

---

766, 323 P3d 231 (2014), for the position that "when a defendant has intentionally made a witness unavailable to testify, the defendant loses the right to object that that evidence should not be admissible on state constitutional confrontation grounds." We note that both parties briefed their arguments prior to the Supreme Court's decision in *Iseli*. Given that recent decision, we cannot conclude that defendant's involvement "in [J]'s decision not to appear" necessarily means that J is "unavailable," for purposes of OEC 804, which is expressly required for the proposition that the state sets forth via *Supanchick*.

[6] Defendant also asserts that the state should have sought a material witness warrant. We need not address that issue, however, as the less-intrusive means, a continuance, was an option that the state did not pursue, and that would have been a sufficiently reasonable escalation in the state's attempt to procure J under the circumstances.

"unavailable" was erroneous because, under the circumstances, there was a high likelihood that additional efforts would have procured J's attendance at trial, and, accordingly, a continuance would have been reasonable.

Here, the evidence demonstrates that J was merely reluctant and that "other reasonable means" were likely to procure her under the circumstances. Specifically, J had told the victim advocate that she felt her presence at the prior hearing had been sufficient. That suggests that J may have simply wanted to avoid making multiple court appearances and that she could have been persuaded to attend had the state taken further steps. Although the state believed that she had been at her sister's house at the time of trial, a continuance would have given the state the time to confirm that she was not home and to see if she was going to return. Finally, because J's testimony was critical to the criminal prosecution, defendant's due process interest in a continuance was significant and the state should have sought a continuance. Collectively, those considerations required the state to intensify its efforts. *See Iseli*, 366 Or at 174 (requiring an intensification of efforts to procure a declarant, when, looking collectively, those efforts are proportional with the relative likelihood of obtaining live testimony).

Therefore, we conclude, in light of *Iseli*, that the trial court erred in determining that J was unavailable for purposes of OEC 804. Accordingly, we reverse and remand the judgment of conviction in Case No. 16CR47326 so that defendant may withdraw his conditional plea. ORS 135.335(3) ("[a] defendant who finally prevails on appeal may withdraw the plea," when that defendant entered a conditional plea of guilty or no contest); *State v. Bernabo*, 224 Or App 379, 389, 197 P3d 610 (2008) (reiterating ORS 135.335(3)). Defendant contends that that disposition also compels that we reverse and remand his probation revocations. We agree with defendant as to Case No. 15CR54291. *See State v. Wilson*, 282 Or App 717, 718, 385 P3d 1233 (2016) (reversing and remanding a probation revocation when that revocation resulted solely from a defendant's conditional guilty plea). However, as to the probation revocation in Case No. 15CR19090, the record reflects that the trial court would have revoked defendant's probation on another basis even without the new conviction.

Defendant does not challenge that ruling of the trial court, and we therefore affirm the probation revocation in that case.

In Case Nos. 15CR54291 and 16CR47326, reversed and remanded. In Case No. 15CR19090, affirmed.